UNITED STATES of America

v.

**Mario EUFRASIO, a/k/a Murph, Appellant.**

UNITED STATES of America

v.

**Santo IDONE, a/k/a Sam, a/k/a Sam from Chester, a/k/a Papa, a/k/a Big Santo, Appellant.**

UNITED STATES of America

v.

**Gary S. IACONA, Appellant.**

Nos. 90–1267, 90–1268, 90–1305.

United States Court of Appeals, Third Circuit.

Argued Oct. 11, 1990.

Decided May 15, 1991.

Rehearing and Rehearing In Banc Denied June 19, 1991.

Jack A. Meyerson (argued), Marc Durant & Associates, Philadelphia, Pa., for appellants Eufrasio and Iacona.

John R. Carroll (argued), Carroll & Carroll, Philadelphia, Pa., for appellant Idone.

Frank J. Marine (argued), U.S. Dept. of Justice, Washington, D.C., Arnold H. Gordon, Albert J. Wicks, Philadelphia, Pa., for appellee.

Before GREENBERG, HUTCHINSON and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

NYGAARD, Circuit Judge.

In these consolidated criminal appeals, appellants Santo Idone, Mario Eufrasio and Gary Iacona stand convicted and sentenced for RICO violations, attempted extortion and illegal gambling. Appellants were charged together and tried jointly before an anonymous jury.

The jury found each defendant guilty on four counts: conspiring to participate, and participating in the affairs of an enterprise through a pattern of racketeering activity and the collection of unlawful debt in viola-

tion of 18 U.S.C. § 1962(d) and (c) (counts one and two) (the "RICO counts")[1]; attempted extortion in violation of 18 U.S.C. § 1951 (count three); and conducting an illegal gambling business in violation of 18 U.S.C. § 1955 (count four).

Appellants' RICO liability was predicated on attempted extortion, illegal video poker machine gambling and collecting unlawful debts. Only Idone was charged with and convicted on a separate racketeering predicate of murder conspiracy.

All appellants allege the following errors: with respect to the RICO counts, the superseding indictment failed to charge a valid pattern of racketeering activity; evidence of uncharged crimes was admitted without adequate limiting instructions and without articulating a Fed.R.Evid. 403 balance; the district court empaneled an anonymous jury without a hearing and without stating its reasons on the record; and, various insufficiencies of evidence warrant reversal of appellants' convictions.

Eufrasio and Iacona argue the trial court erred by not severing their trials from Idone's trial when only Idone was indicted under RICO on the murder conspiracy predicate, evidence of which allegedly prejudiced Eufrasio and Iacona. Additionally, they argue the extortion count of the superseding indictment was ambiguous, and so the trial court erred by denying a requested bill of particulars and curative jury instructions. They also claim the district court's charge to the jury concerning appellants' collection of unlawful debts was inadequate.

Individually, Eufrasio appeals the government's failure to corroborate certain tape recorded statements made by him, and failure to prove he engaged in a "continuous" business of making usurious loans. Iacona argues it was error not to require the government to prove appellants made threats when collecting unlawful debts. Idone contends it was error not to dismiss the murder conspiracy charge from his trial, or alternatively, to sever the RICO counts from his trial on the other charges.[2]

We reject each of appellants' claims on appeal, and will affirm their convictions. We have appellate jurisdiction under 28 U.S.C. § 1291.

## I.

### Facts

Viewed in a light most favorable to the government, trial evidence showed that during 1982 and 1983, Idone participated in the affairs of an organized crime enterprise through a murder conspiracy; and that during 1981–1986, all appellants conspired to and did participate in the same enterprise through a pattern of illegal gambling and the attempted extortion of a competitor of their gambling business, and through the collection of unlawful debts.[3]

### A. The Nature of the Scarfo Enterprise.

From 1981 to 1986, appellants conspired to participate, and participated knowingly in the Scarfo "Family," a Philadelphia and New Jersey based subdivision of La Cosa Nostra ("LCN" or "Mafia").[4] At times rel-

---

1. 18 U.S.C. § 1962(c) provides:
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 18 U.S.C. § 1962(d) makes it unlawful for any person to conspire to violate any provision of § 1962(c).

2. Pursuant to Federal Rule of Appellate Procedure 28(i), appellants adopted each other's briefs and arguments in several respects. Since we reject all of appellants' allegations of error, we need not enumerate here who adopted what.

3. RICO liability may be predicated either on a "pattern of racketeering activity", or alternatively, upon the "collection of unlawful debt". See 18 U.S.C. § 1962(c). A pattern of racketeering activity "requires at least two acts of racketeering activity", 18 U.S.C. § 1961(5), which by definition includes acts or threats involving murder, extortion and gambling. See 18 U.S.C. § 1961(1).

4. The LCN or Mafia is an nationwide organized crime syndicate with local subdivisions, such as the Scarfo enterprise. For a more detailed account of this organization, see *United States v. Pungitore*, 910 F.2d 1084 (3d Cir.1990).

evant to appellants' convictions, the Scarfo organization was a RICO "enterprise"[5] consisting of approximately 60 full members of the LCN, and at least 100 criminal associates. Appellants' participation in Scarfo-related criminal activities resulted in their RICO convictions.

The Boss of the Scarfo enterprise, Nicodemo Scarfo ("Scarfo"), oversaw its activities, and appointed lesser mob officers. Below the enterprise's top leadership were "Capos" (captains), each of whom commanded a "crew" of criminal "soldiers" and "associates". The enterprise's top leadership, Capos and soldiers were "made men", that is formally initiated members of the LCN. Associates were uninitiated colleagues of Mafia soldiers, and were responsible to their sponsoring LCN member.

Associates and soldiers were required by mob rules to obtain their superiors' approval before conducting criminal ventures, and had to report their criminal activities and profits to these superiors. Capos supervised their crews and shared in the proceeds of crew crimes along with the enterprise's top leadership.

Idone was a "made" member of the LCN who, beginning in the early 1970's, served as a Capo in the Scarfo organization. During the period 1981–1986, Idone supervised a crew of soldiers and associates, including Eufrasio and Iacona. Idone's crew participated in the crimes at issue here: the conspiracy to murder Thomas Auferio; the illegal video poker machine gambling business; the attempt to extort competitors of that business; and the collection of unlawful debts. As required by Mafia rules, Capo Idone periodically reported his crew's criminal activities to his Boss, Scarfo.[6] Eufrasio regularly arranged meetings with Scarfo to facilitate Idone's reporting.

The function of soldiers and associates, and of the mob generally, was to make money by illegal means. More specifically, the enterprise's diverse purposes were "to control, manage, finance, supervise, partic-

ipate in and set policy concerning the making of money through illegal means." App. 43.

### B. Idone's Participation in the Enterprise-related Conspiracy to Murder Thomas Auferio.

To enforce mob discipline in 1982, Scarfo ordered Idone and other Capos to kill Harry Riccobene and his supporters. Riccobene was an insubordinate member of the Scarfo organization. Thomas Auferio, a Riccobene supporter, was also targeted for murder. Idone participated in the ensuing conspiracy to murder Auferio. Idone's participation in that conspiracy was racketeering activity constituting, in part, the pattern of racketeering underlying Idone's RICO convictions.

Scarfo's Capos attempted to murder Riccobene more than once during the summer of 1982, but botched the job each time. Scarfo complained to Idone and another Capo, Philip Leonetti. Although subsequently incarcerated, Scarfo continued efforts to kill Riccobene and his supporters.

In early fall 1983, an attempt to kill Riccobene affiliate Thomas Auferio failed. Auferio went into hiding, apparently in Hazelton, Pennsylvania. Scarfo people met with Idone and asked him to help locate Auferio. Idone agreed to have a member of Idone's crew who lived in Hazelton, assist in the hunt for Auferio. A week later, Idone and the other would-be murderers met again. At this meeting Idone said Auferio was no longer in Hazelton, but Idone would have his crew members kill Auferio if they found him.

Eventually, the Scarfo faction succeeded in killing some Riccobene followers. As a result, the efforts to locate and kill Auferio were called off.

### C. Appellants' Participation in the Enterprise-related Illegal Gambling Business.

From 1981 until December 1986, Idone, Iacona, Eufrasio, Francis Peticca (a co-de-

**5.** A RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

**6.** Idone also shared criminal profits with Scarfo, but not with respect to all the crimes at issue in this appeal.

fendant who did not appeal his conviction) and others, conducted an unlawful video poker machine gambling business. Appellants placed illegal gambling machines in restaurants and bars throughout Delaware County, Pennsylvania. Delaware County is adjacent to Philadelphia, a center of Scarfo activities. Appellants' illegal gambling was a direct violation of 18 U.S.C. § 1955,[7] and also was racketeering activity constituting, in part, the pattern of racketeering underlying appellants' RICO convictions.

Through electronic surveillance of Iacona's Auto Center in Chester, Pennsylvania, the FBI intercepted appellants' conversations about their illegal gambling operations. As a result, in December 1986, FBI agents executed search warrants and seized numerous video poker machines and cash gambling proceeds from 21 Delaware County bars and restaurants. A contemporaneous raid of the auto center discovered Iacona, Eufrasio, Idone and Peticca on the premises with more of their video gaming machines, thousands of dollars in cash, gambling records, and Scarfo's address and phone number.

At trial, expert testimony and other evidence showed that appellants had conducted an illegal gambling business involving at least 28 persons and 23 locations; Idone headed that business; Iacona was Idone's partner who worked under Idone by managing day to day gambling activities; and Eufrasio along with Iacona and Peticca, collected gambling revenues and otherwise assisted the illegal gambling operation.

Philip Leonetti, a former LCN member turned government witness, testified that Idone regularly reported to Scarfo on appellants' gambling activities, and also reported the FBI's raid on the auto center. Eufrasio arranged meetings between Idone and Scarfo, in order to assist Idone's reporting. Pursuant to this reporting, and at Idone's request, Scarfo interceded on behalf of Idone in a dispute with the Gambino "Family," a New York subdivision of the LCN, over Idone's gambling operations in Delaware County.

### D. Appellants' Participation in the Enterprise-related Attempt to Extort Their Gambling Competitors.

During the period March to December 1986, appellants attempted to extort Action Vending and Automatic Coin Vending Company, with threats and physical violence, in order to deprive Action and its representatives and business associates (including Automatic) of their right to compete with appellants' gambling operation. Action and Automatic were two businesses which associated to install and operate video poker machines in bars and restaurants surrounding Philadelphia, Pennsylvania. Appellants' attempted extortion of Action and Automatic was a direct violation of 18 U.S.C. § 1951,[8] and also was racketeering activity constituting, in part, the pattern of racketeering underlying appellants' RICO convictions.

Action was owned by Alphonse Sanbe. Ronald Lee and Nicholas Sanbe (Alphonse's

---

**7.** 18 U.S.C. § 1955 reads, in part:
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 (b) As used in this section—
 (1) "illegal gambling business" means a gambling business which ... is a violation of the law of a State or political subdivision in which it is conducted; ... involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and ... has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

**8.** 18 U.S.C. § 1951 provides, in part, as follows:

 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 (b) As used in this section— * * *
 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

father) were partners who owned Automatic.[9] Lee (Automatic) and Alphonse Sanbe (Action) agreed that Action would act as Automatic's agent by distributing, installing and servicing Automatic's video poker machines in Delaware County, Pennsylvania and in Wilmington, Delaware. Under this arrangement, Alphonse Sanbe (Action) collected the profits from the gaming machines on behalf of Lee (Automatic).

Under the business arrangement between Action and Automatic, Lee was in charge of placing gaming machines. Lee increased placements in Delaware County by providing incentives, including low interest loans and monetary bonuses, to bar and restaurant owners. This strategy competed with and frustrated appellants' gambling operations, and gave rise to appellants' attempted extortion of Action and Automatic.

The attempted extortion was triggered after Lee placed a poker machine in the Gold Room, an establishment in Chester, Pennsylvania. The Gold Room had given Lee an exclusive right to place machines on the premises, but in mid–1986, Lee learned that appellant Eufrasio's son, Danny Eufrasio, had taken one of Lee's machines out of the Gold Room and replaced it with one of appellants' poker machines. Lee responded by having his partner, Nicholas Sanbe, file a complaint against Danny Eufrasio with the Chester Police Department.

A few days later, appellant Eufrasio telephoned Lee and told him to drop the police complaint because "it wasn't worth somebody getting hurt over", and Lee was "fooling with the wrong people". App. 1915. Lee knew Eufrasio was involved with Capo Idone, and "understood that if [he, Lee] didn't drop these charges, that [he] was going to get hurt". App.1917. Lee took Eufrasio's threats seriously and started to carry a gun.

Intercepted telephone conversations between Idone, Iacona and Peticca reveal that they conspired to threaten Action and its business associates with physical injury. A September 1986 conversation indicates Idone and Iacona believed that Alphonse Sanbe damaged some of appellants' poker machines, and that appellants should therefore "grab" either Alphonse Sanbe or Herman Fontaine (one of Action's employees) and threaten or inflict physical injury, in order to deter Alphonse Sanbe's and Action's competition with appellants' gambling machine business. App. 3648–49; 3657–58.

Nevertheless, appellants' concluded that, lest they provoke an FBI investigation of themselves, they should not directly carry out the proposed threats or physical violence, but if possible, should enlist Frederick Lupi for the job. Lupi was an associate of Alphonse Sanbe's, soon to be released from jail. Appellants agreed it would be better for Lupi to carry out any threats or physical violence against Alphonse Sanbe.

Idone and Iacona did meet with Lupi. But according to Iacona's intercepted description of that meeting, appellants' plan to enlist Lupi fell far short because Idone, accompanied by Iacona, threatened Lupi himself. At the meeting, Lupi signalled his interest in one particular gaming machine controlled by Action and Automatic, and in competing with Idone's gambling operation generally: Lupi told Idone that Danny Eufrasio had taken Lupi's machine from the Gold Room; that Idone should return the machine; and that Lupi had discussed the Gold Room dispute with the Gambino organization. Lupi added, however, that he had instructed Alphonse Sanbe and his associates not to go to court on the police complaint against Danny Eufrasio. Idone responded forcefully to Lupi, telling him the New York Mafia people had to see Idone before they could direct Lupi to work gambling machines in Delaware County.

Later, appellants discussed among themselves the competition posed by Action and Automatic, and the relationship between Action and Alphonse Sanbe. Eufrasio said appellants "have trouble with Automatic Vending which is ... Nick Sanbe ... and Ronnie [Lee]." App. 4049. Appellants' intercepted conversation indicates they knew Automatic and Action were affiliated busi-

9. Lee was the 91% owner of Automatic.

nesses. Idone said that appellants must stop Nicholas Sanbe from creating incentives for bars and restaurants to replace appellants' gambling machines; and that appellants should return Action's Gold Room machine so that the criminal complaint filed against Danny Eufrasio would be dropped.

On December 2, 1986, Idone told Eufrasio, Iacona and Peticca that if "they [Action and Automatic] gonna start the fight we'll leave the poker machine ... If it's possible we work things out. But then if we don't ... you gotta use other methods that's all." App. 4090–91. Idone instructed his co-conspirators to accumulate more information about their competitors, adding that "then we can ... beat up the one guy." App. 4091. Less than a month later, appellants discussed the fact that Alphonse Sanbe (Action) had agreed to take out a machine he had placed in an establishment called the Peppermill.

### E. Appellants' Enterprise-related Collection of Unlawful Debts.

Expert testimony, appellants' own intercepted conversations, and other trial testimony and evidence proved that appellants collected unlawful debts[10] on numerous usurious loans. These collections are an alternative basis of appellants' RICO convictions.[11]

During the period September to December 1986, appellants and their cohorts collected debts on numerous loans, some with effective annual interest rates ranging from 78% to 283%. One witness testified that he borrowed $4500 from Iacona for twelve weeks, paying interest totalling $540 during that period.

Idone and Iacona were partners who supplied capital and authorized the illegal loans, while Eufrasio acted as their agent in the unlawful lending racket. As required by Scarfo enterprise rules, Idone reported his crew's loansharking activities to Scarfo, and also told Scarfo that Eufrasio loaned money on behalf of Idone in Atlantic City, New Jersey. Eufrasio knowingly assisted in scheduling this reporting to Scarfo.

### F. Procedural History.

Originally, appellants and their fourth co-defendant, Peticca, who does not appeal, were charged in a four count indictment with racketeering, racketeering conspiracy, extortion and illegal gambling. This indictment charged that appellants conspired to and did associate with the Scarfo enterprise through a pattern of racketeering activity occurring over the period 1982–1986. The pattern of racketeering charged against each appellant consisted of extortion and illegal gambling. This original indictment also charged each appellant with collecting unlawful debts, an alternative basis of RICO liability.

Eight months later, the government returned another indictment against appellants. This superseding indictment enlarged the pattern of racketeering activity alleged in the original indictment, by charging an additional racketeering predicate against Idone only: he was charged with participating in the Auferio murder conspiracy. The Auferio murder conspiracy, Racketeering Act One in the Superseding Indictment, is the distinguishing difference between the two indictments. Charging the Auferio murder conspiracy as a racketeering predicate resulted in other differences between the two indictments, but generally speaking, the two indictments are the same but for the murder conspiracy

---

**10.** 18 U.S.C. § 1961(6) provides:

"unlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

**11.** A violation of 18 U.S.C. 1962(c) requires participation in the conduct of a RICO enterprise's affairs through a "pattern of racketeering activity" or the "collection of unlawful debt".

charge against Idone. Both indictments alleged appellants conspired to and did in fact participate in the affairs of the Scarfo enterprise through a pattern of racketeering activity and collecting unlawful debts. Despite the similarities, however, the superseding indictment charged Idone *alone* with the murder conspiracy predicate.

Before trial, Idone made a motion in the alternative under Fed.R.Crim.P. 8 and 14, to either dismiss the murder conspiracy predicate alleged against him, or to sever his trial on the RICO counts (which incorporated the murder conspiracy predicate) from his trial on the two non-RICO counts (extortion and illegal gambling). Idone's motion was denied.

The trial court also denied Eufrasio's and Iacona's pretrial motions to sever Idone's trial from their own, and for a Bill of Particulars on the extortion count. After granting the government's motion for an anonymous jury, the trial court tried appellants jointly.

## II.

### Satisfaction of RICO's Pattern Requirement

■ Each appellant claims that the superseding indictment was flawed because its RICO allegations did not satisfy RICO's pattern requirement. Appellants argue that the murder conspiracy predicate charged against Idone *and* the other charged racketeering predicates do not form a single "pattern of racketeering activity", because the Auferio murder conspiracy was not alleged to involve the same or similar purposes, results, participants, victims or methods of activity associated with the alleged gambling and extortion predicates. Appellants made pre-trial motions to dismiss on this ground.

Appellants' arguments force us to address the meaning of a "pattern of racketeering activity", specifically, the require-

ment that there be some *relationship* between racketeering predicates forming a RICO pattern. Our review is plenary because it requires construction of 18 U.S.C. § 1962(c). *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102 (3d Cir.1981).

Section 1962(c) provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a *pattern of racketeering activity* or collection of unlawful debt.

(Emphasis added.) Since Congress has not provided a complete definition of RICO's "pattern of racketeering activity" requirement, *see H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989), we have been forced to develop the concept with case-by-case analysis. We must decide here whether the Auferio murder conspiracy was a racketeering predicate legally related for RICO purposes to the other predicate acts charged in the superseding indictment.

At the outset, we note that our decision as to whether all the predicates charged in this case form a single pattern of racketeering activity can potentially benefit only Idone. Eufrasio's and Iacona's RICO convictions do not depend at all on the propriety of charging the disputed murder conspiracy predicate, but rather exclusively on the gambling and extortion predicates charged against them in the superseding indictment.[12]

It follows that we need not reverse Eufrasio's and Iacona's RICO convictions if there was sufficient evidence from which the jury could have concluded that they committed the predicate offenses of gambling and extortion charged against them.[13]

12. Appellants' RICO convictions also rest on their collection of unlawful debts, which substitute for a showing that appellants engaged in two or more predicate acts forming a pattern of racketeering activity. *See* 18 U.S.C. § 1962(c).

13. *See, similarly, United States v. Brown*, 583 F.2d 659, 669–70 (3d Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979), holding that if a jury convicts a RICO defendant on multiple predicates and it cannot be deter-

Since we hold there was sufficient evidence of the gambling and extortion predicates charged against Eufrasio and Iacona, *see* below, pp. 567–68, and because they were not charged with participating in the Auferio murder conspiracy,[14] the jury's verdict against Eufrasio and Iacona stands irrespective of whether the Auferio murder conspiracy predicate was properly charged against Idone.

The impact on Eufrasio and Iacona of our inquiry into RICO's pattern requirement aside, we hold that the Auferio murder conspiracy was properly charged against Idone because it was a racketeering predicate legally related to the gambling and extortion predicates charged against each appellant. In other words, we decide that all three charged predicates formed a single pattern of related criminal activity for purposes of 18 U.S.C. § 1962(c). Our interpretation of RICO's pattern requirement compels us to reject arguments that the Auferio murder conspiracy was unrelated to the gambling and extortion predicates.

*H.J. Inc.* is the Supreme Court's current pronouncement on RICO's "pattern of racketeering activity" requirement. The Court confirmed a two-prong test of the pattern requirement:

> [T]o prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are *related, and* that they amount to or pose a threat of *continued* criminal activity.

*H.J. Inc.*, 109 S.Ct. at 2900 (emphasis added, in part). The Court said "relatedness" and "continuity" are "distinct requirements" that must be satisfied in order to establish a RICO "pattern of racketeering activity". *Id.* at 2902. First, charged racketeering predicates must pose a *continuity* of actual or threatened criminal activity. Second, a certain *relationship* must exist among those predicates.

■■ The meaning of the *relationship* prong of RICO's pattern test is at issue here.[15] This prong focuses on the *inter-re-*

---

mined which specific offenses the jury relied upon in reaching its verdict, such that the jury may have relied upon predicate offenses not supported by sufficient evidence, the racketeering conviction must be reversed despite the fact that two of the potential predicate offenses still constituted valid bases for the verdict. *Compare United States v. Riccobene,* 709 F.2d 214 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), holding that *"Brown* does not require that we reverse the convictions of any defendant when there is sufficient evidence from which the jury could have concluded that he did commit every predicate offense charged against him. *Nor does it require reversal when the reviewing court can determine that the jury did not rely on the challenged predicate offense when reaching its verdict on the RICO charge." Id.* at 228 (emphasis added).

**14.** The superseding indictment charged the defendants in this case with predicate racketeering acts as follows (App. 54):

| Defendant | Racketeering Act # and Description |
|---|---|
| SANTO IDONE | # 1 Conspiracy to commit murder |
| | # 2 Hobbs Act Extortion |
| | # 3 Leasing, Setting Up, and Maintaining Devices for Illegal Gambling |
| MARIO EUFRASIO | # 2 Hobbs Act Extortion |
| | # 3 Leasing, Setting Up, and Maintaining Devices for Illegal Gambling |
| GARY S. IACONA | # 2 Hobbs Act Extortion |
| | # 3 Leasing, Setting Up, and Maintaining Devices for Illegal Gambling |
| FRANCIS PETICCA | # 2 Hobbs Act Extortion |
| | # 3 Leasing, Setting Up, and Maintaining Devices for Illegal Gambling |

**15.** As for the continuity prong, Idone merely mentions it on appeal, but we decide it was satisfied in this case.

*H.J. Inc.* held that the continuity requirement can be met by showing that related predicate acts or offenses continued over a substantial period of time, posed a threat of continuing criminal activity, or were part of "an ongoing entity's regular way of doing business". *H.J. Inc.*, 109 S.Ct. at 2902. "Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.*

The predicate acts alleged in the superseding indictment satisfied the continuity requirement because they occurred over the extended period 1981–1986; because, as evidenced by the enterprise's history and the Scarfo/Riccobene war, the Auferio murder conspiracy was an instance of the Scarfo enterprise's regular means of conducting criminal business and maintaining its internal discipline; and furthermore, because all the charged predicates were carried out by appellants in their respective roles within

*lationship* of charged RICO predicates. The relationship requirement exists to ensure that RICO is not used to penalize a series of disconnected criminal acts. "A pattern is not formed by 'sporadic activity,' ... and a person cannot 'be subjected to ... [RICO] sanctions ... simply for committing two widely separated and isolated criminal offenses'". *Id.* at 2900 (quoting from RICO's legislative history, citations omitted).

*H.J. Inc.* noted that "Congress intended to take a flexible approach" to defining a pattern of racketeering activity, and "envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates." *H.J. Inc.*, 109 S.Ct. at 2900. The Court said, "it is ... the relationship that [predicates] ... bear to each other or to *some external organizing principle* that renders them [a pattern]". *Id.* (emphasis added).

The Court also stressed judicial flexibility when it said analysis of RICO's pattern requirement may be guided by Congress' definition of the pattern requirement in the Dangerous Special Offender Sentencing Act, 18 U.S.C. § 3575 *et seq.* (now partially repealed), set forth as Title X of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 922 [16]:

> [C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, *or otherwise are interrelated* by distinguishing characteristics *and are not isolated events.*

*Id.* 109 S.Ct. at 2901, *quoting,* 18 U.S.C. § 3575(e) (emphasis added).

This court of appeals has also spoken about the pattern requirement. In *Banks v. Wolk*, 918 F.2d 418 (3d Cir.1990), we said "all predicate acts in a pattern must somehow be related to the [same RICO] enterprise." *Id.* at 424. Indeed, we took a very

flexible approach to the relationship prong of the pattern requirement, saying

> [W]e should avoid interpreting the relatedness requirement too narrowly.... In organized crime cases, where the RICO enterprise exists solely for criminal purposes, the necessary nexus between the predicate acts and the enterprise will often be enough to satisfy the relatedness requirement.

*Banks*, 918 F.2d at 425. When speaking of the Scarfo enterprise on another occasion, we said,

> [P]redicate acts cannot fairly be characterized as unrelated [when they are] ... committed pursuant to the orders of key members of the enterprise in furtherance of its affairs. Indeed, *the independent existence of [an organized crime] ... enterprise connotes continuity and relatedness* [where] ... the criminal agenda of the enterprise extend[s] beyond the commission of any individual predicate acts....

*Pungitore*, 910 F.2d at 1104 (emphasis added).

■ Following *H.J. Inc.* and our own cases, we hold that when a proven organized crime entity like the Scarfo Family is the relevant enterprise in a RICO case, the relationship prong of RICO's pattern requirement is satisfied by functionally unrelated predicate acts and offenses, if the predicates are undertaken in association with, or in furtherance of criminal purposes of the same organized crime enterprise. Other courts of appeal agree:

> In some cases both the relatedness and the continuity necessary to show a RICO pattern may be proven through the nature of the RICO enterprise. For example, two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise.

*United States v. Angiulo*, 897 F.2d 1169, 1180 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990), *quot-*

---

Idone's "crew", a component of the Scarfo Family which was a "long-term association that exist[ed] for criminal purposes". *See H.J. Inc.* at 2902.

**16.** RICO formed Title IX of the Organized Crime Control Act of 1970.

*ing United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.) (en banc), *cert. denied,* — U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). Thus, when "racketeering acts [are] ... performed at the behest of an organized crime group," that fact alone belies "any notion that the racketeering acts were sporadic or isolated." *Angiulo* at 1180, quoting *Indelicato* at 1384. *See also United States v. Masters,* 924 F.2d 1362, 1366 (7th Cir.1991) (the question of whether acts of an organized crime entity, as distinct from acts of a lawful enterprise that commits occasional criminal acts, form a RICO pattern "rarely is a problem", because "[t]he business of a criminal enterprise is crime ... [its] crimes form a pattern defined by the purposes of the enterprise").

■ Our holding is consistent with Congress' main objective in enacting RICO: "the eradication of organized crime", *see H.J. Inc.* 109 S.Ct. at 2903, because it brings the often highly diversified acts of a single organized crime enterprise under RICO's umbrella. Indeed, "[a] criminal enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and capabilities." *Masters,* at 1367. Our interpretation of RICO's pattern requirement ensures that separately performed, functionally diverse and directly unrelated predicate acts and offenses will form a pattern under RICO, as long as they all have been undertaken in furtherance of one or another varied purposes of a common organized crime enterprise.

This view of RICO's pattern requirement leads us to conclude it was not reversible error to charge and convict Idone with a racketeering pattern including the gambling and extortion predicates, *and* the Auferio murder conspiracy. The murder conspiracy predicate was, for purposes of the pattern requirement, legally related to the gambling and extortion predicates, and they to each other, because all were undertaken to further varied and diverse Scarfo enterprise purposes, namely, to control, manage, finance, supervise, participate in and set policy concerning the making of money through illegal means.

Each charged predicate was related one to the other also because each was carried out by Idone or members of his crew, pursuant to orders of "key members of the enterprise", either Idone or Scarfo. *See Pungitore,* 910 F.2d at 1104. Clearly, Idone's participation in the Auferio murder conspiracy was enterprise-related because Scarfo himself ordered the killing in order to enforce mob discipline. Appellants' gambling and extortion activities were mob-related too, because they were illegal means of making money, supervised and controlled by Idone, a Capo in the Scarfo enterprise.

Furthermore, Idone regularly reported on his crew's gambling operations to Scarfo, and this led Scarfo to intercede on behalf of Idone in order to resolve Idone's dispute with the Gambino organization over a Gambino attempt to place gaming machines in Delaware County. To the extent appellants' attempted extortion was undertaken to further Idone's mob-related gambling operations, the extortion itself was mob-related.

We hold that all the predicates charged in this case form a single pattern of racketeering activity satisfying the relationship prong of RICO's pattern requirement. They are all interrelated by a common nexus with the Scarfo enterprise and its diverse criminal purposes: each predicate racketeering act advanced Scarfo enterprise purposes, each was undertaken at the behest of key members of Scarfo's mob, and most were reported directly to Scarfo.

## III.

### *Rule 8(b) Joinder of Defendants*

■ Eufrasio and Iacona argue that joinder of their trials with Idone's is reversible error because Eufrasio and Iacona were wholly unconnected with and unaware of the murder conspiracy charged as a racketeering predicate against Idone only. Eufrasio and Iacona allege the joinder of their trials with Idone's prejudiced them because the murder conspiracy alleged against Idone infected the entire trial with evidence of uncharged Mafia crimes and the murder conspiracy itself. They claim the joinder

exposed the jury to evidence of numerous mob murders and attempted murders related to the Auferio murder conspiracy and the Scarfo/Riccobene mob war, in which Eufrasio and Iacona did not participate.

Federal Rule of Criminal Procedure 8(b) permits joinder of defendants:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

If joinder is not authorized by Rule 8(b), defendants may not be tried together. *See* 1 C. Wright, *Federal Practice and Procedure* § 144 (2d ed. 1982).

■ Rule 8(b) provides substantial leeway to prosecutors who would join racketeering defendants in a single trial. The rule permits joinder of defendants charged with participating in the same racketeering enterprise or conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant (even separately charged substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with, a commonly charged RICO enterprise or conspiracy. *See United States v. Dickens*, 695 F.2d 765, 778–79 (3d Cir.1982), *cert. denied*, 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983).[17] "[J]oinder ... of a conspiracy count and substantive counts arising out of the conspiracy [is permitted], *since the claim of conspiracy provides a common link*, and demonstrates the existence of a common scheme or plan." *United States v. Somers*, 496 F.2d 723, 729–730 (3d Cir.) (emphasis in *Somers*, quoting Wright and Miller, *Federal Practice and Procedure*, § 144), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 57, 42 L.Ed.2d 58 (1974).

We agree with the Second Circuit's position that a RICO conspiracy charge provides that required link. *See United States v. Friedman*, 854 F.2d 535, 561 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). If Rule 8(b) joinder were construed to require a closer relationship between charged acts than is required by RICO's "pattern of racketeering" requirement, joinder might be prohibited in cases where Congress intended it. *Id.*

■ We review Rule 8(b) joinder *de novo*. *United States v. Somers*, 496 F.2d 723, 729 (3d Cir.), *cert. denied*, 419 U.S. 832, 95 S.Ct. 56, 57, 42 L.Ed.2d 58 (1974). In determining whether a trial court erred by joining multiple defendants under Rule 8(b), we focus on the indictment, not on the proof subsequently adduced at trial. *Id.* at 729. As long as the crimes charged are allegedly a single series of acts or transactions, separate trials are not required. *Id.*

Reviewing the superseding indictment in this case, we conclude that charging and proving the Auferio murder conspiracy as a racketeering predicate against Idone, but not against Eufrasio and Iacona, did not preclude Rule 8(b) joinder of all appellants. As we hold above, *see* p. 564, the murder conspiracy and all the other acts charged in this case were related and formed a single pattern of racketeering activity, because each was committed in furtherance of the Scarfo enterprise. There was no Rule 8(b) misjoinder of appellants because, consistent with the law of joinder in RICO cases, all the criminal acts charged against each defendant, including the murder conspiracy implicating Idone, were undertaken in furtherance of a single, commonly charged racketeering enterprise and conspiracy.

### IV.

*Eufrasio and Iacona's Rule 14 Severance Motions*

■ Eufrasio and Iacona claim the district court erred by denying the pre-trial

---

17. *See also United States v. Cardall*, 885 F.2d 656, 668 (10th Cir.1989); *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir.1988), *cert. denied*, 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *United States v. Caporale*, 806 F.2d 1487, 1510 (11th Cir.1986), *cert. denied*, 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987); *United States v. O'Malley*, 796 F.2d 891, 895 (7th Cir.1986).

**568**

severance motions they made under Rule 14 of the Federal Rules of Criminal Procedure. Eufrasio and Iacona sought to sever the murder conspiracy count charged against Idone.

■■■ Rule 14 permits severance of proper Rule 8(b) joinder:

If it appears that a defendant or the government is *prejudiced* by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court *may* order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

(Emphasis added.) The Rule places the burden of showing prejudice from the joinder on the defendant seeking severance. *United States v. De Peri,* 778 F.2d 963, 983 (3d Cir.1985), *cert. denied,* 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986).

■■■ Appellate review of orders denying Rule 14 severance is potentially two-fold. *U.S. v. Sandini,* 888 F.2d 300, 305–306 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 959 (1990). Since denial of severance is committed to the sound discretion of the trial judge, *see e.g., United States v. Reicherter,* 647 F.2d 397, 400 (3d Cir.1981), we first determine from the record as it was when the severance motions were made, what trial developments were then reasonably foreseeable, and in that light decide whether the court abused its discretion denying severance. *Sandini,* 888 F.2d at 305. While doing so, we keep in mind that a trial court should balance the public interest in joint trials against the possibility of prejudice inherent in the joinder of defendants. *De Peri,* 778 F.2d at 984. Ordinarily, defendants jointly indicted should be tried together to conserve judicial resources. *Sandini,* 888 F.2d at 306. The public interest in judicial economy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy. *De Peri* 778 F.2d at 984.

■■■ If we decide the trial court abused its discretion denying severance, we must look to see whether appellants have pinpointed trial prejudice caused by the joinder they sought to avoid. *Sandini,* 888 F.2d at 305. Although a trial judge may have abused her discretion in denying a Rule 14 severance motion, we need reverse a conviction only if the appellant shows specifically that the denial caused trial prejudice. *Id.* at 305–306, n. 2. An appellant's burden is heavy: he must demonstrate *"clear and substantial prejudice* resulting in a *manifestly unfair trial." Reicherter,* 647 F.2d at 400 (emphasis added). "It is not sufficient for [a defendant] ... merely to allege that severance would have improved his chances for acquittal." *Id.* at 307.

■■■ With respect to prejudice, "[t]he proper question on appeal is whether the jury could have been reasonably expected to compartmentalize the allegedly prejudicial evidence in light of the quantity and limited admissibility of the evidence." *De Peri,* 778 F.2d at 984. Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant. *See Sandini,* 888 F.2d at 307. Neither a disparity in evidence, nor introducing evidence more damaging to one defendant than others entitles seemingly less culpable defendants to severance. *United States v. Sebetich,* 776 F.2d 412, 427 (3d Cir.1985), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988).

We hold the trial court did not abuse its discretion by denying Eufrasio's and Iacona's Rule 14 severance motions. Severing Idone's trial was not required, even if some potential for prejudice might be associated with evidence of the Auferio murder conspiracy predicate.

Since Eufrasio and Iacona were jointly indicted with Idone, and all appellants were charged with the same conspiracy to participate in the same Scarfo enterprise, the public interest in judicial economy favored joinder. Common evidence of appellants' gambling and extortion activity and loansharking, would have been admissible against each appellant in separate trials, as

would evidence of the Auferio murder conspiracy which proves the nature, history and means of the enterprise charged against each appellant. Because there would have been substantial overlap in the evidence presented in separate trials, we cannot say the trial court abused its discretion denying Eufrasio's and Iacona's Rule 14 severance motions. The substantial public interest in the judicial economy of a joint trial outweighs the potential for prejudice to Iacona and Eufrasio associated with evidence of Idone's murder conspiracy.

Furthermore, since the Scarfo enterprise was recognized as the underlying criminal enterprise, evidence of other criminal activities engaged in by that organization would have been admitted in separate trials. Indeed, since evidence of the Auferio murder conspiracy could have been admitted as evidence of the underlying RICO enterprise in separate trials, denial of a severance motion which alleged evidence of that crime would cause trial prejudice, cannot be an abuse of discretion.[18]

### V.

### *Idone's Pretrial Motion in the Alternative*

Idone's pretrial motion under Fed.R. Crim.P. 8 and 14 requested either dismissal of the Auferio murder conspiracy predicate alleged against him as Racketeering Act One, or in the alternative, severance of Count One (the RICO conspiracy count) of the superseding indictment in its entirety. Idone argues that the district court's denial of this pretrial motion in the alternative was reversible error because Idone's trial on the non-RICO counts was prejudiced by evidence of the Auferio murder conspiracy predicate.

Initially, we must clarify Idone's motion. On the one hand, it sought dismissal of Racketeering Act One (the Auferio murder conspiracy predicate). Alternatively, it

asked expressly for severance of *Count One alone* (the racketeering conspiracy count under 18 U.S.C. § 1962(d)), if the district court did not dismiss Racketeering Act One.

In our view, it is not clear whether Idone's motion requested severance of Count Two (the substantive racketeering count under 18 U.S.C. § 1962(c)) and Count Five (the RICO forfeiture count) *along with Count One*, as the alternative to dismissal of Racketeering Act One (the murder conspiracy allegation). It would be illogical for Idone to have requested severance of Count One (RICO conspiracy) only as the alternative to dismissing the murder conspiracy predicate allegation, because Counts One, Two and Five were *all* RICO counts incorporating the Auferio murder conspiracy as Racketeering Act One. The gist of Idone's pretrial motion in the alternative was that the Auferio murder conspiracy allegation, common to all the RICO counts against Idone, was too prejudicial to have been incorporated into or joined with any of the other charges against him. Thus, it seems likely Idone misdrafted his pretrial motion.

██ In the interests of clarity, we will assume Idone's motion sought to dismiss the murder conspiracy allegation, or in the alternative, to sever *all* RICO counts incorporating it. This does not affect our decision on the merits.

Looking first at Idone's motion "under Federal Rules of Criminal Procedure 8 and 14", *see* App. 105–107, as a motion to *dismiss* Racketeering Act One (the murder conspiracy allegation), we hold the district court did not err by denying the motion. In effect, Idone's motion to dismiss challenges the propriety of one element of the superseding indictment. We review challenges to the sufficiency of indictments *de novo.*

---

18. Since we hold appellants' Rule 14 motions were properly denied, we need not decide whether Eufrasio and Iacona demonstrated that joinder of their trials with Idone's actually caused them clear and substantial trial prejudice. *See Sandini,* 888 F.2d at 306–307. Nor

need we decide whether appellants waived their right to appeal the denial of severance: even assuming appellants preserved the severance issue for appeal, the government prevails under our Rule 14 analysis.

Applying this standard, we find no reason why Racketeering Act One should have been dismissed. The Auferio murder conspiracy was charged against Idone as a racketeering predicate. Proof of two or more racketeering predicates were essential elements of the government's RICO case against Idone. *See* 18 U.S.C. § 1962(c). As a racketeering predicate, the Auferio murder conspiracy charge was properly charged, and the district court did not err by refusing Idone's request to dismiss it. The government had the right to charge and prove every element constituting the RICO charges against Idone, including the murder conspiracy predicate, even if proof of it revealed unsavory aspects of Idone's criminal past to the jury.[19]

 Next, analyzing Idone's pretrial motion as a claim that the RICO and non-RICO counts against him were misjoined under Rule 8, we will apply the standard of Rule 8(b), which expressly authorizes joinder of *defendants*. Other courts have held that Rule 8(b) applies exclusively to joinder questions in cases, like this one, involving multiple defendants. *See United States v. Kopituk*, 690 F.2d 1289, 1312 (11th Cir. 1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 2090, 77 L.Ed.2d 300 (1983); *see generally*, 1 C. Wright, *Federal Practice and Procedure*, 143–144 (2d ed. 1982). They assert Rule 8(a), which expressly authorizes joinder of *offenses*, "applies only in cases involving a single defendant charged with multiple offenses."[20] *Kopituk*, 690 F.2d at 1312. We have not addressed the issue. Indeed, we will not resolve it here because whether Rule 8(a) or (b) controls, our conclusion is the same.

In the interests of justice, we apply the less permissive standard of Rule 8(b), the same one used to analyze Eufrasio and Iacona's Rule 8 claim (*see* above, p. 568), to hold there was no misjoinder of the RICO and non-RICO counts against Idone. The gambling and extortion alleged as substantive violations in the non-RICO counts were also charged as racketeering predicates in the RICO counts. Furthermore, the gambling and extortion along with the Auferio murder conspiracy and loansharking charged against Idone, were all allegedly undertaken by him in furtherance of and in association with the same racketeering enterprise and conspiracy. Thus, joinder of the RICO and non-RICO counts against Idone was proper. All the conduct charged against Idone constituted a single

---

**19.** We have also taken into account that Rules 8 and 14 authorize joinder and severance of *"offenses"*, but not expressly dismissal of *elements* of offenses. Nevertheless, Rule 14 expressly permits a trial court to remedy prejudicial joinder with "whatever ... relief justice requires." Thus, we assume Rule 14 relief might include in some circumstances dismissal of a redundant allegation under one element of a joined offense, if such dismissal (instead of severance of the entire joined offense) would cure prejudicial joinder.

**20.** The standards of Rule 8(a) and (b) joinder are nearly the same. Both permit joinder of offenses and defendants, respectively, when a transactional nexus exists between the offenses or defendants to be joined. Only Rule 8(a), however, permits joinder on an additional theory, that is when offenses "are of the same or similar character":

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged ... *are of the same or similar character* or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Fed.R.Crim.P. 8 (emphasis added).
Theoretically, then, Rule 8(a) provides wider latitude for joinder than does Rule 8(b). Nonetheless, in many cases the focus of joinder of offenses or defendants will be the same: do the offenses or defendants to be joined arise out of a common series of acts or transactions. This need not always be the case.
Accordingly, its seems to us that contrary to the jurisprudence in other circuits, when a joinder of offenses charged against the same defendant is challenged, the literal meaning of the Rule requires application of Rule 8(a), irrespective of whether multiple defendants are involved in the case.

series of related acts furthering the Scarfo enterprise conspiracy and its purposes.

▮ The outcome is the same when we review Idone's pretrial motion from the angle of Rule 14. We hold that the trial court did not abuse its discretion by denying Idone's request to sever the RICO counts in their entirety.

Succinctly put, the same evidence needed to prove the gambling and extortion racketeering predicates charged in the RICO counts would also prove the non-RICO gambling and extortion allegations. Even if evidence of the Auferio murder conspiracy predicate might possibly prejudice the jury against Idone in the non-RICO phases of trial, that mere possibility did not compel Rule 14 severance as a matter of law. The jury could reasonably be expected to confine its consideration of the Auferio murder conspiracy evidence to its deliberations on the RICO counts. Furthermore, as mentioned earlier in connection with Eufrasio's and Iacona's Rule 14 severance motions, it was within the discretion of the trial court to determine if the economies afforded by a joint trial of all the charges against Idone outweighed any potential for trial prejudice caused by joinder of the RICO and non-RICO counts.[21]

## VI.

### Alleged Rule 403 Errors

Appellants argue that the trial court abused its discretion by admitting evidence of uncharged Mafia crimes at trial without articulating a balance between the probative value and the prejudicial effect of the evidence as required by Federal Rule of Evidence 403, and also committed error by not providing appropriate limiting instructions addressing that evidence.[22] Since an error admitting evidence is alleged, we review the trial court for abuse of discretion. *In re Japanese Electronic Products*, 723 F.2d 238, 260 (3d Cir.1983), *rev'd on other grounds, Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *cf. Pfeiffer v. Marion Center Area School District*, 917 F.2d 779, 781 (3d Cir. 1990) (holding that the plenary standard of *In re Japanese Electronic Products* for review of a Rule 402 relevancy ruling is "deemed without effect.")

Rule 403 permits a trial court to exclude evidence of unquestioned relevance, if its relevance is overshadowed by the risk of unfair prejudice, confusion of issues, misleading the jury, or waste of time.[23] Admission of evidence under Rule 403 may be reversible error when the district court abuses its discretion. *See e.g., United States v. Schwartz*, 790 F.2d 1059 (3d Cir. 1986). Appellants contend there was reversible Rule 403 error.

The government asserts appellants waived any Rule 403 errors by failing to object explicitly on Rule 403 grounds when the uncharged Mafia crimes evidence was introduced at trial. The government points to Fed.R.Evid. 103(a) which requires that timely objection be made in order to preserve an evidentiary issue for appeal.[24]

---

**21.** Since we hold the district court did not abuse its discretion denying Idone's Rule 14 severance motion, we need not decide whether Idone has demonstrated on appeal that the denial of his severance motion caused him "clear and substantial" trial prejudice. *See Reicherter*, 647 F.2d at 400.

**22.** Appellants challenge the admission of detailed evidence of uncharged Mafia crimes undertaken during the Scarfo/Riccobene mob war, and of other heinous Mafia crimes. *See* Eufrasio Br. 23–25. Appellants do not contend it was Rule 403 error to admit evidence of the Auferio murder conspiracy.

**23.** Fed.R.Evid. 403 reads as follows:
Although relevant, evidence may be excluded if its probative value is substantially out-

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**24.** Fed.R.Evid. 103 reads in pertinent part, as follows:
(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objec-

Appellants respond that their pre-trial motions *in limine* constituted Rule 403 objections for purposes of appellate review. Indeed, "[w]hile normally an objection to the admission of evidence must be raised at trial to be preserved, this court will sometimes permit evidentiary questions to be preserved by a motion *in limine*." *See Bruno v. W.B. Saunders Co.*, 882 F.2d 760, 767 (3d Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 880, 107 L.Ed.2d 962 (1990); *American Home Assurance Co. v. Sunshine Supermarket Inc.*, 753 F.2d 321, 324–25 (3d Cir.1985).

We need not decide the merits of the waiver question in detail, because whether or not appellants' motions *in limine* preserved their Rule 403 claims for appeal, the district court did not abuse its discretion admitting the disputed uncharged Mafia crimes evidence. Our reasoning is as follows.

■ If, on the one hand, appellants' motions *in limine* did *not* constitute specific Rule 403 objections to admission of the uncharged Mafia crimes evidence, then the trial court was not required to strike a Rule 403 balance on the record *sua sponte.*

"Since the 'specific' objection requirement of Fed.R.Evid. 103(a) was not complied with, the trial judge was not required to deal with Rule 403.... [T]he dynamics of trial do not always permit a Rule 403 analysis in ... detail.... [T]o require a detailed balancing statement in each and every case is unrealistic.... *[W]here [a] Rule 403 [objection] is not invoked, the trial judge's balancing will be subsumed in his ruling.*"

*United States v. Long*, 574 F.2d 761, 766 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978) (emphasis added). Thus, if we determine no Rule 403 objection was made in this case, the district court's failure to expressly weigh probative value against prejudicial effect would not be error, unless the resulting admission of

evidence was otherwise an abuse of discretion. For reasons discussed below, we decide the admission of the disputed evidence was not an abuse.

On the other hand, if appellants' motions *in limine* were the equivalent of specific Rule 403 objections to the uncharged crimes evidence, then we must confront the trial court's failure to articulate its balance between the probative value and the prejudicial effect of the evidence in one of two ways: either we decide the trial court implicitly performed the required balance; or, if we decide the trial court did not, we undertake to perform the balance ourself. *See United States v. Lebovitz*, 669 F.2d 894, 901 (3d Cir.), *cert. denied*, 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). Either way, the trial court's failure to expressly articulate a Rule 403 balance when faced with a Rule 403 objection, would not be reversible error *per se.* *Id.*

■ For purposes of deciding this appeal only, we assume that appellants' motions *in limine* constituted effective Rule 403 objections to the disputed evidence; and furthermore, that the district court implicitly struck a Rule 403 balance when it admitted the uncharged Mafia crimes evidence. Accordingly, we will affirm the district court's decision to admit that evidence, because we also decide that decision was not an abuse of discretion. A trial judge is given "very substantial discretion" when striking a Rule 403 balance. *Long*, 574 F.2d at 767. "If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Id.*

■ The district court did not abuse its discretion striking its implicit balance in favor of admitting the evidence. Evidence of uncharged crimes may be introduced even against a defendant without knowledge of such crimes, if the uncharged crimes are proof of some elements of the crimes actually charged against such de-

tion, if the specific ground was not apparent from the context....

\* \* \* \* \* \*

(d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting

substantial rights although they were not brought to the attention of the court.

fendant. Rule 403 does not as a rule prohibit the government from presenting its strongest possible case against criminal defendants.

Generally speaking, it is for the prosecutor, not the defendant, to shape the government's trial strategy with a view toward sustaining its heavy burden of proof. On the other hand, the presence or absence of a genuine need for the questioned evidence is a legitimate part of the balancing analysis required by Federal Rule of Evidence 403.

*Schwartz,* 790 F.2d at 1061. *See also United States v. Sheeran,* 699 F.2d 112, 118 (3d Cir.), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

As the district court instructed the jury, the uncharged Mafia crimes evidence admitted in this case went to prove important elements of the RICO counts charged against appellants: the existence and nature of the Scarfo enterprise and conspiracy, acts undertaken in furtherance of it, and appellants' knowing association with it. The uncharged crimes evidence demonstrated the history, structure and internal discipline of the Scarfo enterprise, and the regular means by which it conducted unlawful business. The disputed evidence was probative of appellants' respective roles within the enterprise's larger organization, history and operations. Thus, the relevance of the uncharged crimes evidence to the government's case against appellants was substantial, certainly enough to offset its potential to cause prejudice for appellants.

We also find that the disputed uncharged crimes evidence worked more of a prejudice, if any, on the credibility of the governments' own witnesses. These witnesses, former LCN members, were more directly involved in the uncharged crimes than were appellants. Furthermore, appellants were the ones who brought out some of the uncharged crimes testimony in their attempt to discredit the government's witnesses in front of the jury. It follows that appellants should not be heard now to say the disputed testimony they elicited was so

prejudicial as to have impermissibly bent the jury's verdict against them.

In conclusion, we will affirm the trial court's decision to admit the uncharged crimes evidence, even though the court did not expressly articulate its Rule 403 analysis. Nevertheless, we repeat what we have said elsewhere:

[Rule 403] balancing should be performed in the first instance and *on the record* by the trial court who is in the best position to determine the weight to be given the various relevant factors.

*Lebovitz,* 669 F.2d at 901 (emphasis added). We encourage trial courts to make their Rule 403 balancing explicit whenever possible: express reasoning always helps appellate review.

 As for appellants' contention that jury instructions were so lacking with respect to admission of the uncharged crimes evidence as to require reversal, we disagree. The district court told the jury many times that appellants were to be judged individually, and only on evidence applying to the specific charges against each one. The trial court also instructed that appellants were not on trial for any uncharged conduct. Finally, appellants never requested specific limiting instructions focusing on the uncharged crimes evidence. We conclude, therefore, that there was no shortcoming in jury instructions, certainly none constituting reversible error.

## VII.

### *Empaneling Anonymous Jury*

Appellants contend it was error for the trial court to grant the government's motion for an anonymous jury without holding an evidentiary hearing on the issue of threats to juror safety, and without recording its reasons for granting the motion. We review the district court's decision for abuse of discretion, and must be "particularly deferential" to the trial court's "substantial discretion" to empanel an anonymous jury. *United States v. Scarfo,* 850 F.2d 1015, 1023 (3d Cir), *cert. denied,* 488 U.S. 910, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988).

In *Scarfo*, we upheld a decision to empanel an anonymous jury, reasoning that anonymity dispelled jurors' fears for their own safety. We noted this promoted impartial, dispassionate jury verdicts.

[E]ven in routine criminal cases, veniremen are often uncomfortable with disclosure of their names and addresses to a defendant. The need for such information in preparing an effective defense is not always self-evident.... [J]ury anonymity promotes impartial decisionmaking.

. . . .

Because the [jury] system contemplates that jurors will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than anathema to, the jury concept. In short, we believe that the probable merits of the anonymous jury procedure are worthy, not of a presumption of irregularity, but of disinterested appraisal by the courts.

*Id.* 850 F.2d at 1023. *Scarfo* resolved that empaneling an anonymous jury "is not intrinsically suggestive of any inference of guilt", at least where adequate jury instructions concerning the need for anonymity are given. *Id.* 850 F.2d at 1026. We also said in *Scarfo* that if measures are taken to inform a defendant of jury demographics and to permit ample voir dire, an anonymous jury need not impair a defendant's right to intelligently exercise peremptory challenges. *Id.* at 1022–23.

Appellants rely on *Scarfo* to argue that we should impose certain procedural prerequisites upon anonymous juries. Appellants would have us say that trial courts *must* hold evidentiary hearings on juror safety, and *must* record their reasoning when ordering anonymous juries. However, the record in *Scarfo* indicates the trial court only heard oral argument on the anonymous jury issue. That argument was not put in the record. Furthermore, the *Scarfo* court did not issue findings when it granted the government's motion for an anonymous jury. We conclude

*Scarfo* is not precedent for the new procedural requirements appellants recommend.

A trial court has discretion to permit an anonymous jury without holding an evidentiary hearing on juror safety, if the court believes there is potential for juror apprehension. A trial judge is usually well-aware of the ambience surrounding a criminal trial and the potential for juror apprehensions. Publicity surrounding previous Scarfo enterprise-related racketeering prosecutions may well have raised, in this case, juror apprehensions for their own safety, and a corresponding desire on the part of the judge to ease that tension. In such a situation, an anonymous jury is justified, as long as defendants are afforded full voir dire. We find no evidence that appellants were not afforded such voir dire here, or that empaneling the anonymous jury otherwise prejudiced the jury against appellants. Thus, we hold the trial court did not abuse its discretion ordering the anonymous jury in this case.

While a trial court may hold the hearings and make the record findings recommended by appellants, these procedures are not required as a matter of law. Thus, the trial court's failure to articulate express findings when it impaneled the anonymous jury was not reversible error. We will, however, suggest a better practice, that trial judges record their findings and reasons when they empanel anonymous juries. Recorded findings facilitate intelligent appellate review. Our position here parallels our approach in other discretionary contexts. *See, e.g., Lebovitz*, 669 F.2d at 901 (counseling trial courts to preserve a record of their balancing under Fed.R.Evid. 403).

## VIII.

### *Alleged Errors with Respect to Extortion*

Eufrasio and Iacona claim Count Three of the superseding indictment never clearly identified the intended victim of the attempted extortion, but rather ambiguously identified the extortion target as "Action Vending, its officers, owners, agents, employees, and business associates". App.

62. They claim they were surprised and prejudiced by evidence that Action and Automatic were associated business ventures. On this ground, appellants requested a pretrial bill of particulars, and later, a specific jury instruction.[25] They say it was reversible error for the district court to deny their requests, and that the jury instructions on the extortion charge given by the district court were inadequate.

■■■ Whether to grant a bill of particulars lies in the discretion of the trial court, and denial is reviewed for abuse of discretion. *United States v. Armocida,* 515 F.2d 49, 54 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Since the purpose of a bill of particulars is not to permit "wholesale discovery of the Government's evidence", Eufrasio and Iacona must establish on appeal that denying their requested bill prevented them from developing a meaningful defense against surprise evidence. *Id.* Furthermore, an indictment charging a statutory crime is sufficient if it substantially follows the language of the criminal statute, provided that its generality does not prejudice a defendant in preparing his defense nor endanger his constitutional guarantee against double jeopardy. *See United States v. Addonizio,* 451 F.2d 49, 58 n. 7 (3d Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972).

Applying these standards, we hold the trial court did not abuse its discretion denying appellants' request for a bill of particulars. The extortion count in the superseding indictment provided appellants with adequate notice of the allegations against them, and it tracked the language of the federal extortion statute by specifying the time period of the alleged offense, its victims, objectives and extortionate means.[26]

Also, Eufrasio and Iacona have not shown they were prejudiced or surprised by evidence that Action and Automatic, and their representatives and business associates, were affiliated. Count Three of the indictment clearly stated that the alleged extortion was against "Action Vending, its officers, owners, *agents, employees, and business associates.*" App. 62 (emphasis added). Automatic was Action's business associate. Appellants' were given tapes of intercepted conversations revealing they knew Action and Automatic were associated business ventures, and that Lee, Lupi and both Sanbes were variously associated with Action, as its partners, agents or em-

---

**25.** The jury instruction proposed by appellants (App. 365) read, in part, as follows (emphasis added):

> Count Three of the Indictment charges each of the defendants with interference of commerce by threats or violence. The indictment identifies the principals, officers, directors and associates of Action Vending Company, Alfonse Sanbi's [sic] as the victims of the extortion. As such, *it is the extortion of Alfonse Sanbi [sic] and his company and not some other person or company* which is the crime charged in Count Three of the Indictment and on which you must deliberate. There has been testimony concerning Ronald Lee. *Ronald Lee is not an owner of Action Vending and as such he is not the victim of the extortion alleged in Count Three of the Indictment.*

**26.** Compare the language of 18 U.S.C. § 1951 (quoted in pertinent part in note 8 herein), with the language of Count Three of the superseding indictment (App. 62–63, emphasis added):

> From in or about March, 1986, up to and including December, 1986, in the Eastern District of Pennsylvania and elsewhere ... defendants ... did unlawfully and knowingly attempt to obstruct, delay, and affect commerce ... and attempted to do so, by extortion as that term is defined in Title 18, United States Code, Section 1951(b)(2): to wit, they attempted to obtain the property of Action Vending, its officers, owners, *agents, employees, and business associates,* that is the right to pursue a business including the right to business accounts and unrealized profits, the right to solicit business, and the right to compete with the defendants' video poker machine business and any other company engaged in the business of operating video poker machines, said property to be obtained with the consent of Action Vending, its owners, officers, *agents, employees, and business associates,* such consent being induced by the wrongful use of actual and threatened force, violence and fear including the fear of financial, economic and physical injury to Action Vending, its owners, officers, *agents, employees, and business associates* in that the defendants demanded that Action Vending, its owners, officers, *agents, employees, and business associates* remove their video poker machines from certain locations, refrain from soliciting the defendants customers, and refrain from offering more favorable business terms that [sic] those offered by the defendants.

ployees. These conversations and the language of the indictment belie appellants' surprise claim. Eufrasio and Iacona had adequate knowledge to develop a defense against the extortion charge.

■ As for appellants' requested jury instruction on the extortion count, we hold the district court did not err refusing to give it. Refusing a requested instruction is error "only if the instruction was correct, not substantially covered by other instructions, and was so important that the omission of the instruction prejudiced the defendant." *United States v. Smith*, 789 F.2d 196, 204 (3d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Here, the instruction requested was incorrect because it differed substantially from the indictment. Appellants' requested instruction would have restricted jury deliberations to evidence of extortionate acts aimed directly at Action *alone*, whereas Count Three of the indictment was much broader: it charged extortion of Action's *business associates, agents and employees*, such as Automatic, Lee Sanbe, and Lupi.

Finally, we hold appellants were not prejudiced by the refusal to give the requested instruction, because the instruction actually given by the district court adequately covered the attempted extortion charge. Appellants do not contend the district court's instruction was incorrect, but rather, they argue the district court did not adequately explain "what was charged in Count 3, who was the victim and what was the nature of the extortionate demand." Eufrasio Br. at 26. We disagree. The record shows the district court instructed the jury correctly on all essential elements of the charge, and advised it to refer to a copy of the superseding indictment which the jury retained during deliberations.

**27.** Since we reject Eufrasio's corroboration argument, we also hold the district court did not err by refusing to give Eufrasio's requested jury instruction, which incorporated a corroboration requirement.

**28.** Since Eufrasio did not raise this argument in his Rule 29 motion for a judgment of acquittal, we will review it only for plain error. *See Riccobene*, 709 F.2d at 229. As our discussion of the law indicates, Eufrasio's claim is without

## IX.

### *Alleged Errors with Respect to Collection of Unlawful Debt*

■ Eufrasio argues that the government was required to corroborate his tape recorded statements which proved he collected unlawful debts. Eufrasio's contention is without merit because tape recorded statements, such as his own, made prior to or during the commission of a crime, need not be corroborated.[27] *See United States v. Muskovsky*, 863 F.2d 1319, 1324–25 (7th Cir.1988), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989); *United States v. Raymond*, 793 F.2d 928, 930–31 (8th Cir.1986).

■ Eufrasio also alleges that it was error not to prove he engaged in a "continuous" business of making usurious loans, because evidence that he made a single unlawful loan cannot show such continuity[28]. That is not the law. While 18 U.S.C. § 1961(6) requires that an unlawful debt collected have been "incurred in connection with the *business* of gambling ... or the *business* of lending money or a thing of value" at usurious rates, a "continuous" business of making unlawful loans is not required. Only one act of collecting or attempting to collect unlawful debt is necessary to establish that predicate act. *See United States v. Vastola*, 899 F.2d 211, 228 n. 21 (3d Cir.), *vac'd on other grounds*, —— U.S. ——, 110 S.Ct. 3233, 111 L.Ed.2d 744 (1990); *see also United States v. Pepe*, 747 F.2d 632, 645, 673–75 (11th Cir.1984). An actual exchange of cash need not be shown, only a single act which would tend to induce another to repay on an unlawful debt incurred in the business of lending money. *See Pepe*, 747 F.2d at 673–75.

merit, and therefore, we hold there was no plain error.

Furthermore, even if it was plain error to fail to prove Eufrasio and his co-appellants engaged in a "continuous" business of making unlawful loans and collecting unlawful debts, their RICO convictions would stand nonetheless on their conspiracy to participate, and participation in, the conduct of the affairs of the Scarfo enterprise through a pattern of illegal gambling and attempted extortion.

■ Finally, Iacona claims it was error for the government not to allege or prove appellants threatened persons for failure to repay unlawful loans. This claim has no merit because threats are simply not an element of the offense of collection of unlawful debts under relevant federal and state usury laws. *See, similarly, United States v. Biasucci,* 786 F.2d 504, 512–13 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 107, 93 L.Ed.2d 54, 56 (1986) (holding that defendant's knowledge of the specific interest rates charged on usurious loans is not needed for a collection of unlawful debts violation under RICO).

### X.

### *Sufficiencies of Evidence*

■ Each appellant claims that various insufficiencies of evidence warrant reversals of their convictions. The standard governing our review of sufficiency claims is whether, viewing the evidence in a light most favorable to the government, there was substantial evidence upon which a reasonable jury could have based its verdict. *United States v. Leon,* 739 F.2d 885, 890 (3d Cir.1984). "The evidence need not unequivocally point to the defendant's guilt as long as it permits the jury to find the defendant guilty beyond a reasonable doubt." *Pungitore,* 910 F.2d at 1129. After carefully reviewing appellants' claims, which are set forth below, we find them to be without merit.

■ Idone argues trial evidence was insufficient to prove that appellants' acts of illegal gambling, attempted extortion, and usurious lending constituted participation in the conduct of Scarfo enterprise affairs, as is required by 18 U.S.C. § 1962(c). He claims evidence was insufficient to prove appellants were "employed by or associated with" the Scarfo enterprise when undertaking these prohibited acts. *See* § 1962(c) [29]. He alleges also that there not sufficient evidence showing appellants participated in the Scarfo enterprise by collecting unlawful debts, and were "actually in the business of making loans at unenforceable rates". Idone's Amended Br. at 29. Finally, Idone claims evidence was insufficient to prove any extortion conspiracy or attempted extortion. Idone claims that evidence of threats made by him only shows he was angry about, and wanted to retaliate for vandalism of several of Iacona's video poker machines. Idone's Amended Br. 32–36.

Eufrasio and Iacona also assert there was insufficient evidence showing that their respective participation in the charged pattern of racketeering constituted participation in the conduct of Scarfo enterprise affairs, or that they were each employed by or associated with the enterprise when engaged in the charged racketeering.[30] They also say that trial evidence was insufficient to prove the necessary relationship among the Auferio murder conspiracy and other charged predicate acts, or that these

**29.** The "association" requirement of 18 U.S.C. § 1962(c) requires that any defendant prosecuted thereunder "must be shown to have been aware of at least the general existence of the enterprise named in the indictment". *U.S. v. Castellano,* 610 F.Supp. 1359 at 1401 (S.D.N.Y. 1985). The same is true if a defendant is charged under § 1962(d) with a conspiracy to violate § 1962(c). *United States v. Jannotti,* 729 F.2d 213, 226 (3d Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1984) ("In order to establish a conspiracy to violate section 1962(c), 'the government must prove beyond a reasonable doubt that ... the individuals knowingly agreed to participate in the "enterprise" through a pattern of racketeering.'" *Id.* at 226, quoting *Riccobene,* 709 F.2d at 220–21.) This association requirement insures "that the government show, at a minimum, that the defendant was aware of the existence of a group of persons, organized into a structure of some

sort, and engaged in ongoing activities, which the government can prove falls within the definition of enterprise contained in section 1961(4)." *Castellano,* 610 F.Supp. at 1401. It is not necessary that a RICO defendant have "specific knowledge of every member and component of the enterprise"; rather, "it is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *United States v. Rastelli,* 870 F.2d 822, 827–28 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 515, 107 L.Ed.2d 516 (1989).

**30.** Iacona alleges relatedly (*see* Iacona Br. 15–17) that the district court erred when it: (1) refused appellants' requested jury instructions on the 'association' requirement of § 1962(c), which would have cautioned the jury not to consider the enterprise's name ("Scarfo Fami-

acts show continuity of racketeering activity. Like Idone, Eufrasio and Iacona argue that evidence did not prove they each committed extortionate acts or collected unlawful debts, or that any such acts were related to the LCN.

After careful review of the entire record on appeal, we conclude none of appellants' several sufficiency claims has merit. Without reciting the pertinent trial evidence, we hold that evidence was sufficient to permit a reasonable jury to conclude beyond a reasonable doubt, as the jury in this case did, that each appellant committed each crime for which they stand convicted in this case.

### XI.

### *Conclusion*

Having carefully considered Idone's, Eufrasio's and Iacona's appeals, we find them to be without merit. We will affirm the judgments of sentence and conviction with respect to each.

ly") as evidence of appellants' guilt (Iacona Br. at 16); (2) "highlighted" the prejudicial name of the enterprise while restating the government's evidence of each appellant's association with the Scarfo organization (*id.*); (3) failed to "specifically" caution the jury that "they must be satisfied with such evidence beyond a reasonable doubt" (*id.*); and (4) told the jury that "the government must show [appellants'] ... association in fact as part of its burden to show the existence of the enterprise". *See id.*, referring to district court instruction at App. 3380.

After reviewing these allegations of error, we find them to be without merit. The district court's instructions concerning the association requirement of § 1962(c) were correct, and appellants were not prejudiced by the refusal of their requested instructions.