

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-26-1998

# United States v. Ramos

Precedential or Non-Precedential:

Docket 96-7356

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"United States v. Ramos" (1998). *1998 Decisions.* Paper 147.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/147

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 26, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7356

UNITED STATES OF AMERICA

v.

LAZARO ANTONIO RAMOS,
a/k/a Tony Ramos

LAZARO ANTONIO RAMOS,
Appellant

Appeal from the United Stated District Court
for the Middle District of Pennsylvania
(D.C. Crim No. 92-cr-00172)

Argued: January 28, 1998

Before: MANSMANN, COWEN, and ALITO, Circuit Judges

(Filed June 26, 1998)

STEPHEN M. LATIMER, ESQUIRE
 (Argued)
Loughlin & Latimer
9 Kansas Street
Hackensack, NJ 07601
Attorney for Appellant
Lazaro Antonio Ramos

DAVID M. BARASCH, ESQUIRE
THEODORE B. SMITH, III.,
 ESQUIRE (Argued)
Office of the United States Attorney
Federal Building
228 Walnut Street
Harrisburg, PA 17108
Attorneys for Appellee
United States

OPINION OF THE COURT

ALITO, Circuit Judge.

This case requires us to decide whether the district court properly denied prisoner Ramos's 28 U.S.C. S 2255 motion alleging that the evidence presented at trial was insufficient to support his conviction under 18 U.S.C. S 924(c)(1) in light of the Supreme Court's interpretation of that provision in United States v. Bailey, 116 S. Ct. 501 (1995).[1] We conclude that the evidence was sufficient, and we therefore affirm.

I.

Ramos was indicted and tried before a jury for conspiracy to distribute cocaine, in violation of 21 U.S.C. S 841(a)(1); distribution in excess of 100 grams of cocaine, in violation of 21 U.S.C. S 841(a)(1) and 18 U.S.C. S 2; distribution in excess of 100 grams of heroin, in violation of 21 U.S.C. S 841(a)(1) and 18 U.S.C. S 2; and using and carrying firearms during and in relation to drug trafficking crimes, in violation of 18 U.S.C. S 924(c)(1) and 18 U.S.C. S 2.

The evidence at trial showed that Ramos and his co-conspirators, including Roman Blanco and two men called "Chemono" and "Pappitto," participated in a conspiracy that sold drugs in a second-floor apartment at 227 South Queen

_____

1. The Supreme Court's recent decision in Muscarello v. United States, 1998 WL 292058 (Sup. Ct. June 8, 1998), which construed the term "carries" in 18 U.S.C. S 924(c)(1), is inapplicable here.

2

Street in York, Pennsylvania. Ramos and Blanco rented the third-floor apartment of the same building to store the drugs being sold in the apartment below. Two firearms, a sawed-off shotgun and a .357 magnum revolver, were also stored in the third-floor apartment. Only Ramos and Blanco had access to the third-floor apartment.

At trial, two witnesses testified that at times they saw firearms in the second-floor apartment. Candida Valentin testified that she saw a firearm in that apartment on one occasion:

> Q: When you went to the second floor apartment was there ever any time when you saw any weapons?
>
> A: Yes.
>
> Q: Do you recall when that would have been?
>
> A: No, it's been a long time.
>
> Q: What do you remember about seeing the weapons on the second floor?
>
> A: Well, it was a weapon.
>
> Q: A weapon. Can you describe it?
>
> A: And it was a handgun and he told me he had bought it and I wanted to see it out of curiosity, "Tony," okay and he showed it to me. I had it in my hands and "Johnnie" didn't like the idea of me having it in my hands. He told him to take it away from me. That was the only time I seen it.

A64-65.

The second witness, Albert Lee King, Jr., testified that he saw firearms in the second-floor apartment while purchasing drugs there. He stated that he saw weapons (a large caliber silver handgun and a sawed-off shotgun) lying on the table when he went to the apartment. He also testified that he saw a man called "Tony" pick up a gun and that a "tall fellow had a shotgun in his hand one time."

Without objection, the district court instructed the jury in accordance with our court's interpretation of the concept of "use" under S 924(c)(1). See United States v.

3

Theodoropoulos, 866 F.2d 587, 597 (3d Cir. 1989). The district court stated:

> It may be that a person used a firearm during and in relation to a drug trafficking crime if you find that the circumstances surrounding the presence of a firearm in a place where drugs are traded suggest that the firearm was located so as to be quickly and easily available for use during drug transactions.
>
> The presence of a loaded firearm in a place where drugs are possessed with an intent to distribute may be sufficient to prove that a firearm was used during and in relation to a drug trafficking crime.
>
> When I say that a firearm was used, I don't mean in the sense of someone holding it and pointing it orfiring it. It's whether the firearm was employed in any way to assist in or facilitate a drug trafficking crime.

A88.

The jury convicted Ramos on all four counts, and he was sentenced to a total term of imprisonment of 228 months (three concurrent terms of 168 months on the first three counts and a consecutive term of 60 months on the final count). He was also ordered to pay fines and special assessments. The conviction was affirmed by this court in an unpublished judgment order. United States v. Ramos, No. 93–7223 (3d Cir. 1993). Two years later, the Supreme Court held in Bailey that in order to be convicted under 18 U.S.C. S 924(c)(1)2 a defendant must be shown to have actively employed the firearm during and in relation to the underlying offense. 116 S. Ct. at 508.

In 1996, Ramos filed the pro se S 2255 motion that is the subject of this appeal. In his motion, Ramos argued that his counsel had been ineffective and that the evidence at trial was insufficient to support his conviction under

_____

2. 18 U.S.C. S 924(c)(1) states, in pertinent part:

> Whoever, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, shall, in addition to
> the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years . . .
.

4

Bailey. The district court disagreed and denied his motion. Although the district court concluded that Valentin's testimony was insufficient to support Ramos's conviction under S 924(c)(1),3 the court held that King's testimony was sufficient even under the Bailey "use" standard. Ramos appealed, and we granted a certificate of appealability pursuant to 28 U.S.C. S 2253(a) limited to the S 924(c)(1) issue.

II.

In his S 2255 motion, Ramos asserted that the evidence presented at trial was insufficient to sustain a S 924(c)(1) conviction under the Bailey "use" standard. On appeal, Ramos further argues that the jury instructions regarding this element were erroneous in light of Bailey. We will address each of these arguments.

A. Sufficiency of the Evidence

In contending that the evidence was not sufficient to show "use" under Bailey, Ramos specifically argues that King did not properly identify Ramos, whose first name is Antonio, as the "Tony" whom Ramos saw holding the hand gun. Appellant's Br. at 10-11. The government responds, first, that a rational jury could have concluded that Ramos was the "Tony" to whom King referred and, second, that the evidence in any event was sufficient to sustain Ramos's S 921(c)(1) conviction under a conspiracy theory of liability. Gov't's Br. at 14-17. In considering the sufficiency of the evidence presented at trial, the appropriate standard is whether, viewing the evidence in the light most favorable to the government as verdict winner, a jury could have found every element of the crime beyond a reasonable doubt. United States v. Carr, 25 F.3d 1194, 1201 (3d Cir. 1994).

1. Guns on the Table as "Use"

The first question to be addressed is whether King's
_____

3. The district court concluded that the unusual and "somewhat surreal" scene of a drug dealer actually surrendering a weapon to a customer does not satisfy the requirement that a defendant refer to, brandish or display a gun as a visible but forceful presence. D. Ct.'s Order at 9-10.

testimony that guns were lying on a table in the room where a drug transaction took place is sufficient to sustain a S 924(c)(1) conviction. We conclude that it is.

In Bailey, the Supreme Court held that "use" under S 924(c)(1) requires a showing of active employment by the defendant. 116 S. Ct. at 505. The Court defined active employment as including "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm." Id. at 508. The Court further noted that "a reference to a firearm calculated to bring about a change in the circumstances of the predicate offense is a `use,' just as the silent but obvious and forceful presence of a gun on a table can be a `use.' " Id. (emphasis added). In contrast, when the Supreme Court discussed the "mere presence" of guns, it described the presence of guns in a nearby closet for the purpose of providing a sense of security and/or emboldening a defendant. Id. at 508. To the Court, this latter situation evidenced storage and not active employment. Id.

King's testimony is sufficient to meet the requirements of "use" as established in Bailey. According to King, the guns were placed in plain view on the table while he was in the apartment buying drugs. As the Supreme Court explicitly stated in Bailey, the "silent but obvious and forceful presence of a gun on the table can be a `use.' " 116 S. Ct. at 508. If the guns had been out of King's sight (for example, under a couch or in a drawer of the table), they would merely have been available for the drug sellers. But since King testified that the guns were placed in plain view on the table, his testimony was sufficient to show "use."

The men's handling of the gun further supports the conclusion that the guns were "used." King testified that on at least one occasion he witnessed a man holding the handgun, and on another occasion a man held a shotgun. If, as we believe, the guns could be viewed as "a silent but obvious and forceful presence" while lying on the table, they could reasonably be viewed as creating an even more forceful presence when the men were actively holding them.

2. Ramos's Criminal Liability

The next question is whether the government established that Ramos was criminally liable for this use. After viewing

6

the evidence in the light most favorable to the government, we conclude that the evidence is sufficient to establish Ramos's guilt under S 924(c)(1).

a. "A Tony"

Ramos's principal argument is that King never identified Ramos as the "Tony" whom King saw pick up a gun and, indeed, that King never identified Ramos as being present in the apartment when King was buying drugs and the guns were displayed. We conclude, however, that the evidence was sufficient to support the inference that Ramos was the "Tony" to whom King referred. Blanco testified that he and Ramos sold the drugs from the second-floor apartment while Chemono and Pappitto made the deliveries. Three other witnesses also identified Ramos as one of the men who sold drugs in the second-floor apartment and said that his nickname was "Tony." See A36, A38, A50 (Blanco); A52-53, A54 (Burgos); A61-62 (Valentin); A70-71, 74 (Garcia). No other participant in the conspiracy went by that name. Viewing this evidence together with King's testimony, a reasonable jury could infer that Ramos was the "Tony" who was present in the apartment selling drugs and holding the gun.

In reaching this conclusion, we acknowledge that King's testimony was less than clear. King testified in relevant part as follows:

> Q. Do you know a man by the name of Roman
> Antonio Blanco?
>
> A. Yes, ma'am, I do.
>
> Q. How do you know him?
>
> A. From buying drugs?

A.79-80.

> Q: Were there other individuals in that apartment
> from whom you purchased drugs besides Mr.
> Blanco?
>
> A: Yeah, I got drugs from another guy, Roman Blanco.
>
> Q: Well, Mr. Blanco is Roman Blanco.

7

A: Okay, well, him and there is a tall fellow I got drugs from.

Q: Do you recall a name?

A: I used to call him Meta and they responded to that.

Q: What's that word mean?

A: Meta means look in Spanish.

Q: Did you ever see any weapons when you went to 227, or I shouldn't say that, to the apartment on South Queen Street?

A: Yes, ma'am, I did.

Q: Can you tell the jury what you saw?

A: I seen a large caliber silver handgun and I seen a sawed-off shotgun.

Q: Can you describe what the sawed-off shotgun looked like?

A: It was about this long and it had a pistol grip to it. (Indicating) It was about like that.

Q: Are you saying it didn't have a stock?

A: No ma'am, it didn't have a stock. Yes, that's what I'm saying. It didn't have a stock to it.

Q: Now who -- was there somebody who had possession of the guns at the time that you saw them or were they just there?

A: They were just laying on the table.

Q: Did you ever see anybody in that apartment actually pick up a gun?

A: Yes, I seen a "Tony" pick up the gun and say like this at one time. And the tall fellow had a shotgun in his hand one time.

Q: The tall fellow, and he the person that you refer to as Meta?

A: I refer to all of them as Meta.

Q: Why did you do that?

A: Because they didn't tell me their names.

A81-83.

Although this testimony obviously provided grist for a jury argument, we see nothing in this exchange that precluded a rational jury from inferring that the "Tony" whom King saw pick up a gun was Ramos. To be sure, it is unclear whether King was also referring to Ramos when he mentioned "the tall fellow" who sold him drugs or "the tall fellow" who held a shot gun in his hands on one occasion, but in either event a rational jury could still infer that Ramos, whose nickname was "Tony," was the"Tony" identified by King as holding a gun. The argument now advanced by Ramos's attorney was one for the jury, which had the opportunity to see and hear the witnesses. This argument does not provide a ground for S 2255 relief.

b. Pinkerton Liability

In addition, the government's evidence is sufficient to sustain Ramos's S 924(c)(1) conviction under a Pinkerton theory of liability. A defendant convicted of conspiracy is liable for the reasonably foreseeable acts of his co-conspirators committed in furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640 (1946). This court has held that a defendant may be found guilty of violating S 924(c)(1) under a Pinkerton theory of liability. United States v. Casiano, 113 F.3d 420, 427 (3d Cir.), cert. denied 118 S. Ct. 221 (1997).

Even if King's testimony were not sufficient to show that Ramos himself used or carried a firearm during and in relation to a drug trafficking offense, his testimony was clearly sufficient to show that one or more of the other conspirators did so. Moreover, there was ample evidence to show that Ramos was a member of the conspiracy (he was convicted of that very crime) and that S 924(c)(1) violation was committed in furtherance of the conspiracy. King's testimony was sufficient to establish that at least one member of Ramos' conspiracy used guns in furtherance of the conspiracy. Blanco and Ramos rented the second-floor apartment so to sell drugs; it was used for that purpose; and King testified that he bought drugs from men in the second-floor apartment. On at least one occasion when

9

King was buying drugs in that apartment, the men selling drugs had guns on the table.[4] At times, one of them even held a gun while King was in the apartment buying the drugs.

The use of the guns in furtherance of the conspiracy was also reasonably foreseeable. The co-conspirators stored the drugs and the guns in the third-floor apartment, and Ramos had access to that apartment. A logical inference is that he knew that the guns were in the third-floor apartment and that he knew that the guns were there for possible future use during the process of selling of the drugs. Additionally, even if Valentin's testimony was not enough to demonstrate "use" under Bailey, it certainly shows that Ramos at times had a gun in the second-floor apartment while he was selling drugs. If Ramos had a gun in the apartment, it would certainly be reasonably foreseeable to him that his co-conspirators would have a gun in that apartment and that they would have the guns on the table or in their hands.

Ramos next argues that because King did not affirmatively identify a person holding a gun, none of the conspirators could be guilty of violating S924(c)(1). This argument is faulty because, in order to establish Pinkerton liability, it is not necessary to establish the identity of the conspirator who personally committed the substantive offense. It is sufficient to show that this individual was a co-conspirator, that he or she committed the substantive offense, and that he or she did so in furtherance of the conspiracy. Here, there was ample evidence to support such a finding. Accordingly, there was sufficient evidence to support Ramos's S 924(c)(1) under a Pinkerton theory of liability.

B. Jury Instructions

Ramos's remaining argument on appeal is that the "use" instruction given to the jury at trial was erroneous in light of Bailey. However, Ramos made no reference to the jury

_____

4. King's description of the guns (a large silver handgun and sawed-off shotgun) matches the description of two of the guns stored in the third floor apartment with the drugs.

10

instructions in his S 2255 motion before the district court, and the district court understandably did not interpret his motion as raising a question regarding the instructions. Under these circumstances, we are hesitant to consider the issue on appeal. See United States v. Shovlin, 464 F.2d 1211 (3d Cir. 1972) (refusing to consider two additional grounds for habeas relief that were not raised before the district court or briefed before this court). Moreover, even if we were to read Ramos's pro se S 2255 motion as raising the issue, he still would not be entitled to relief in light of the Supreme Court's recent decision in United States v. Bousley, 1998 WL 244204 (May 18, 1998). Because he did not raise the jury instruction issue on direct appeal, he procedurally defaulted on this issue, and under Bousley it is apparent that Ramos cannot demonstrate either "cause" for failing to raise the issue on direct appeal or "actual innocence." Bousley held that a S 2255 movant cannot show "cause" for failing to make a Bailey argument on direct appeal by demonstrating that circuit law at the time would have made any such argument futile. Furthermore, Bousley concluded that, in order for a S 2255 movant to show actual innocence, the movant must show "factual innocence, not mere legal insufficiency." Id. at * 5. Here, where the evidence was sufficient to support the S 924(c)(1) conviction, that standard obviously could not be met.

III.

For these reasons, we affirm the district court's order denying Ramos's motion under 28 U.S.C. S 2255.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

11