**UNITED STATES of America**

**v.**

**Randy THOMPSON, Defendant.**

**No. 4:16–cr–00019–19**

United States District Court, M.D. Pennsylvania.

Signed November 2, 2016

George J. Rocktashel, U.S. Attorney's Office, Williamsport, PA, for the United States.

## MEMORANDUM

Matthew W. Brann, United States District Judge

## I. BACKGROUND

Speakers of nearly every tongue have developed their own variation on the human truism "you are the company you keep." A stark reminder of the influence our contemporaries have on us and of the innate desire to associate with those we consider similar to ourselves, the truism was bluntly commemorated at Proverbs 13:20: "He that walketh with wise men shall be wise: but a companion of fools shall be destroyed." One might suggest that the truism underlies the evidence at the heart of this motion to sever, weighty evidence of an elaborate drug network involving several confederates who ought to be tried as they allegedly operated—together.

On February 11, 2016, a federal grand jury sitting in Williamsport, Lycoming County, Pennsylvania returned a Superseding Indictment that charged Defendant Randy Thompson with conspiring, along with eighteen other co–Defendants, to distribute 100 grams or more of heroin, crack cocaine, and buprenorphine in Lycoming County, Pennsylvania and its surrounding areas.

According to the Superseding Indictment, the charges stemmed from Mr. Thompson's involvement in a vast drug distribution network whose agents originated in Philadelphia, Pennsylvania and utilized rental cars or other forms of transportation to infiltrate various locales along the Interstate 80 corridor in both Columbia and Lycoming Counties in central Pennsylvania.

As counsel for the Government has subsequently detailed during the course of several guilty plea hearings for certain of Mr. Thompson's co–Defendants, the hallmark of the drug distribution network at the center of this case was its ability to quickly respond to heroin orders and deploy throughout the region. According to the Government, a core set of mobile telephone numbers well known to loyal drug customers formed the digital business platform of the operation.

Title III wiretap surveillance authorized by this Court captured Mr. Thompson arranging drug deals with drug purchasers on one of the Target Telephones known to investigators. Mr. Thompson was eventually arrested, together with several alleged co-conspirators, near a local motel that served as one of the conspiracy's bases of operation. At the time of Mr. Thompson's arrest, law enforcement officers also recovered extensive drug paraphernalia, drug proceeds, and one of the mobile telephones that federal investigators had targeted as part of the authorized wiretap.

On September 7, 2016, the Defendant filed this motion to sever, in which he argues that he was improperly joined under Federal Rule of Criminal Procedure 8(b) and consequently, that severance is appropriate under Federal Rule of Criminal Procedure 14(a). The motion ripened on October 26, 2016, when Defendant's reply brief deadline passed. For the reasons set forth herein, Defendant's motion is denied.

## II. LAW

 "Motions to sever are governed by Federal Rule of Criminal Procedure 14, which permits the trial court to grant a defendant's motion for severance if it appears that the defendant will be prejudiced by a joint trial with other defendants."[1] "The Rule places the burden of showing prejudice from the joinder on the defendant seeking severance."[2] "A claim of improper joinder under Federal Rule of Criminal Procedure 14 must demonstrate clear and substantial prejudice."[3]

 "Indeed, there is a presumption against severance because it is 'assum[ed] that closely related charges are being tried together.'"[4] "[A] trial court should balance the public interest in joint trials against the possibility of prejudice inherent in the joinder of defendants."[5] Thus, "denial of severance is committed to the sound discretion of the trial judge."[6]

## III. ANALYSIS

For the reasons set forth below, namely the appropriateness of joinder and the lack of clear prejudice, the Defendant's motion is denied.

**A. Joinder was appropriate under Federal Rule of Criminal Procedure 8(b), because the Superseding Indictment alleges that Mr. Thompson and his co–Defendants conspired to operate an intricate drug distribution network, and the evidence reveals substantial common links between Mr. Thompson and his co–Defendants.**

Federal Rule of Criminal Procedure 8(b) sanctions the joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 8(b) further clarifies that "[t]he defendants may be charged in one or more counts together or

1. United States v. Console, 13 F.3d 641, 655 (3d Cir. 1993).

2. United States v. Eufrasio, 935 F.2d 553, 568 (3d Cir. 1991).

3. United States v. Gorecki, 813 F.2d 40, 43 (3d Cir. 1987) (internal quotation marks and citation omitted).

4. United States v. Nguyen, 793 F.Supp. 497, 503 n.10 (D.N.J. 1992) (quoting United States v. Velasquez, 772 F.2d 1348, 1355–56 (7th Cir.1985)).

5. Eufrasio, 935 F.2d at 568.

6. Eufrasio, 935 F.2d at 568.

separately. All defendants need not be charged in each count."

■■■ As the Supreme Court of the United States made clear in Zafiro v. United States, "There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials 'play a vital role in the criminal justice system.'"[7] Thus, as the United States Court of Appeals for the Third Circuit has recognized:

> The rule permits joinder of defendants charged with participating in the same ... conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant (even separately charged substantive counts) are charged as ... acts undertaken in furtherance of, or in association with, a commonly charged ... conspiracy.[8]

■■■ "Rule 8 is construed liberally in favor of initial joinder."[9] "Trial judges may look beyond the face of the indictment to determine proper joinder in limited circumstances."[10] As such, "Where representations made in pretrial documents other than the indictment clarify factual connections between the counts, reference to those documents is permitted."[11]

■■■ Moreover, as relevant to this particular case, "A conspiracy charge 'provides a common link and demonstrates the existence of a common plan' for purposes of Rule 8(b)."[12] In addition, "Two or more conspiracies may be joined under Rule 8 so long as they are related as part of a common scheme."[13]

■■■ "When determining whether joinder is appropriate, a court generally looks to the indictment."[14] The Superseding Indictment alleges that from August 2014 through the date it was returned, Mr. Thompson and eighteen co–Defendants (three of whom have pled guilty at the time of this writing) engaged in a conspiracy to distribute drugs by way of an extensive network that tracked the I–80 corridor in the greater Williamsport area.[15] It further alleges that Mr. Thompson and his coconspirators employed the following manner and means to effectuate their agreement to distribute heroin, which manner and means point to the presence of common links and confirm the propriety of joinder from the outset:

1. The conspirators traveled by rental cars and other vehicles from Philadelphia and its vicinity to the Williamsport, Pennsylvania area for the purpose of obtaining, transporting, and

**7.** 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (quoting Richardson v. Marsh, 481 U.S. 200, 209, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)).

**8.** Eufrasio, 935 F.2d at 567. Moreover, the Third Circuit has explicitly held that "[j]oinder is permitted of a conspiracy count and substantive counts arising out of the conspiracy, since the claim of conspiracy provides a common link, and demonstrates the existence of a common scheme or plan." United States v. Somers, 496 F.2d 723, 729–30 (3d Cir. 1974).

**9.** United States v. Bullock, 71 F.3d 171, 174 (5th Cir. 1995).

**10.** United States v. McGill, 964 F.2d 222, 242 (3d Cir. 1992).

**11.** Id.

**12.** United States v. Persico, 621 F.Supp. 842, 851 (S.D.N.Y. 1985).

**13.** Id.

**14.** United States v. Giampa, 904 F.Supp. 235, 264 (D.N.J. 1995).

**15.** ECF No. 25.

distributing heroin, and other controlled substances.

2. The conspirators distributed controlled substances, including heroin, crack cocaine, and buprenorphine, to a network of drug users and sellers along the Interstate 80 corridor between Bloomsburg and Williamsport.

3. The conspirators rented hotel and motel rooms in Loyalsock Township, Linden, Danville, and Bloomsburg, Pennsylvania, as well as in other locations for the purposes of storing, packaging, and selling heroin and cocaine and otherwise facilitating the distribution of controlled substances.

4. The conspirators used various residences in and around Williamsport, Danville, Bloomsburg, and Philadelphia to process, store, and keep controlled substances and to store and keep cash, materials for processing and re-packaging controlled substances for distribution and sale, and records and documents concerning drug trafficking activities.

5. The conspirators used multiple mobile telephones, along with social media, to communicate concerning heroin and crack cocaine transactions, to facilitate the distribution of those substances, to identify when they were prepared to supply drugs to their customers, and to maintain contact and share information with members of the conspiracy.

6. The conspirators sent mass text messages via mobile phones to numerous drug customers concerning the availability of heroin and other controlled substances.

7. The conspirators traveled by rental cars and other vehicles to deliver heroin and other controlled substances to various individuals, at diverse locations between Bloomsburg and Williamsport.

8. The conspirators transported and transferred the cash proceeds from the distribution of heroin and other controlled substances using vehicles and ATM machines and also retained a portion of such proceeds on or about their persons.

9. The conspirators bought, sold, traded, and possessed firearms in exchange for cash and controlled substances and to facilitate the distribution of controlled substances.

10. The conspirators acquired firearms, vehicles, and residences, including 810 Rhodes Alley, Williamsport, Pennsylvania, with the proceeds from their drug trafficking activities.[16]

As the Government characterizes him, Mr. Thompson served as "an active and integral" component of the charged conspiracy.[17] Like several of the other co-conspirators here, Mr. Thompson allegedly took part in the drug distribution operation that had its base at the Grandview Motel in Linden, Lycoming County, Pennsylvania during late January 2016.[18] In particular, Count 11 of the Superseding Indictment charges Mr. Thompson and three of his co-conspirators with possession with intent to distribute 1,140 bags of heroin on January 15, 2016—an additional means by which the Defendants carried out the conspiracy's primary objective.

Although the Defendant is married with three children and purportedly resides in

16. See ECF No. 25 at 4–6.

17. ECF No. 334 at 4.

18. See ECF No. 241 at 2–3.

Bensalem, Bucks County, Pennsylvania, video and physical surveillance placed him nearly two hundred miles northwest at the Grandview Motel during the time immediately preceding his arrest.[19] Mr. Thompson, along with certain male and female co-conspirators, purportedly shared two motel rooms out of which they coordinated drug distribution across several local communities.[20]

One of Mr. Thompson's key lines of communication with drug buyers and suppliers was allegedly a mobile cell phone number known as "Target Telephone # 7" in the Title III wiretap surveillance authorized by this Court and carried out by special agents with Federal Bureau of Investigation. Target Telephone # 7 was one of the several mobile telephone numbers identified by FBI special agents as having been used by members of the conspiracy to coordinate operations and arrange transactions. Specifically, various communications obtained during the course of the wiretap investigation revealed that Mr. Thompson and alleged coconspirators Lamont Johnson, Chantel McFarlin, and Alkeisha Edwards agreed to distribute heroin and cocaine out of the Grandview Motel from January 14, 2016 through January 21, 2016.[21] According to the Government, the various Target Telephone numbers utilized by this conspiracy were well known to drug purchasers throughout the central Pennsylvania region. Mr. Thompson's possession of Target Telephone # 7, in addition to his usage of that phone to coordinate drug deals, is described in greater detail below.

However, to first elaborate further as to the particulars of Mr. Thompson's arrest, the Government represents that Mr. Thompson and his co-conspirators would use a distinctive orange 2002 Chevrolet Avalanche pickup truck to transport quantities of drugs, drug paraphernalia, and illicit proceeds between the motel rooms and local drug customers and back again.[22] Vehicle registration revealed that the orange pickup truck was registered to Mr. Thompson, and the Defendant acknowledged as much on an intake financial affidavit.[23]

According to the Government, Mr. Thompson and his fellow co-conspirators would meet drug customers at various public locations throughout the greater Williamsport area and engage in drug exchanges from the orange pickup truck and another vehicle.[24] When physical surveillance detected "recognizable patterns of multiple drug customers entering the vehicles for brief periods in quick succession," investigators obtained search warrants authorizing them to search the motel rooms and the two vehicles.

Thereafter, on January 20, 2016, investigators stopped the orange pickup truck after it departed the motel.[25] Inside the truck, investigators found fellow female co-conspirator Chantel McFarlin riding with Mr. Thompson.[26] Investigators would shortly discover that Ms. McFarlin, as the Government described the scene, had $2,400.00 in cash drug proceeds "secreted inside her bra," while Defendant Thompson had another $800.00 stuffed in his wal-

19. Id.

20. Id. at 3.

21. ECF No. 334 at 4.

22. See id. at 3.

23. See id. See also ECF No. 255 at 2.

24. ECF No. 241 at 3.

25. Id.

26. Id. at 3–4.

let and pants pockets.[27] Co–Defendant McFarlin later reported to investigators that Defendant Thompson had instructed her to hide the money when he realized that the police were stopping the vehicle.[28]

A subsequent search of the two motel rooms used by the cadre revealed heroin, multiple bags of crack cocaine, small unused zip-lock bags commonly used to package cocaine and cocaine base, 500–count boxes of blue glassine bags, and a digital scale used to package and weigh heroin.[29] Surveillance also indicated that Mr. Thompson frequently moved "back and forth" between the two motel rooms during the course of his stay.[30]

In addition to the aforementioned evidence, police also arrested another female co–Defendant and motel roommate, Alkeisha Edwards, upon stopping the vehicle in which she was driving as she departed the motel.[31] After Ms. Edwards arrived at the local Pennsylvania State Police barracks, the state trooper who had transported her discovered that she had attempted to hide two 14–bag bundles of heroin in the rear seat of the state police patrol vehicle.[32]

State Police also recovered Target Telephone # 7—the same telephone allegedly used by Mr. Thompson—on Ms. Edwards's person.[33] A test call confirmed that the mobile phone was still being intercepted.[34] Several of those conversations between Mr. Thompson and drug purchasers are discussed more fully now.

The first telephonic record indicates that the following exchange allegedly occurred on January 14, 2016 at 1:51 p.m. between Mr. Thompson and a known drug purchaser named "Kylie" who contacted Target Telephone # 7. The exchange discusses Kylie picking up a "fifty" of cocaine at the Grandview Motel:

[Mr. Thompson initiates an outgoing call on Target Telephone # 7 to the female drug purchaser known to investigators as "Kylie" using the mobile telephone number 814–826–5896.]

- Kylie: "Hello."
- Thompson: "Kylie."
- Kylie: "What's up hun?"
- Thompson: "Come to the hotel to get the fifty."
- Kylie: "Oh all right, so it's the one you usually stay at?"
- Thompson: "Yeah."
- Kylie: "Alright I'm on my way."
- Thompson: "Alright."
- Kylie: "All right hun." [35]

In reply, the Defendant contends that "there is no evidence that it was Mr. Thompson on the phone" because "[t]here has been no voice recognition evidence to prove that in fact it was this defendant." [36] Nevertheless, on January 14, 2016, the date the above call was made, investigators conducting surveillance observed Mr. Thompson's orange Avalanche, initially at the Sheetz convenience store in Linden at approximately 12:53 p.m., and then again

27. Id. at 4.

28. Id.

29. Id.

30. Id.

31. Id.

32. Id.

33. Id.

34. ECF No. 334 at 6.

35. ECF No. 256 at 3–4.

36. ECF No. 255 at 1.

near the Pizza Hut on the Golden Strip in Williamsport at approximately 1:42 p.m.[37]

According to the Government, Target Telephone # 7 was also utilized by other members of the conspiracy to arrange drug deals at various other times. For instance, just prior to the previous exchange, investigators captured the following discussion on Target Telephone # 7 between co–Defendant Lamont Johnson and the same female drug purchaser:

[At 1:31 PM, Lamont Johnson received an incoming call on Target Telephone #7 from Kylie]

- Johnson: "Yo."
- Kylie: "Yeah what's up bro."
- Johnson: "What's up?"
- Kylie: "Hey, where should I go to?"
- Johnson: "We on the strip [referring to the Golden Strip shopping plaza]."
- Kylie: "Oh, go to the strip?"
- Jonson: "Yeah, how much you got again?"
- Kylie: "Alright, um, uh I'll send it to you." [38]

Following this initial phone conversation, Kylie communicated with Target Telephone # 7 by text message as follows:

- At 1:34 p.m., Kylie texted Target Telephone # 7: "I got 100 cash n 150 stamps [referring to food stamps] she wants 8 [referring to eight bags of heroin for another customer] n I need a 50 [referring to half-gram bag of cocaine] n 5 [referring to five bags of heroin]."
- Target Telephone # 7 responded at 1:40 p.m.: "Oh ok where u at."

- At 1:41 p.m. Kylie texted, "Getting on the strip," and then texted, "Where should I go."
- Target Telephone # 7 texted at 1:41 p.m., "Come to the pizza hut parking lot."
- At 1:43 p.m., Kylie texted, "Here," and then at 1:44 p.m., "Maroon sebring."
- Target Telephone # 7 then texted at 1:44 p.m., "Come on the other side."
- At 1:45 p.m. Kylie replied, "I did. I don't see u."
- At 1:46 p.m., Target Telephone # 7 texted a description of the vehicle he was operating: "Orange pick up truck."
- Kylie acknowledged the meeting location in a text at 1:47 p.m., "I'm walking over to u." [39]

Then, on January 19, 2016, at 10:21 p.m., Mr. Thompson's alleged coconspirator Lamont Johnson partook in the following conversation on Target Telephone # 7 with a drug customer referred to as A.D.:

[Mr. Johnson received an incoming call on Target Telephone # 7 from A.D. who was using 570–974–7692.]

- During the conversation, A.D. said, "Yo, can I come see you bro?"
- Johnson replied, "What you all needed?"
- A.D. said, "I got forty on the dot."
- Johnson responded, "I'm gonna call you right back in a second."
- A.D. said, "Alright I can wait till the morning bro, you hear me." Johnson responded, "Yeah I heard you."
- A.D. said "Alright bro let me know." [40]

**37.** ECF No. 334 at 8.

**38.** Id. at 6–7.

**39.** Id. at 7.

**40.** Id. at 9.

Mr. Thompson's primary arguments against the aforementioned evidence and the propriety of joinder are: first, that there exist multiple sub-conspiracies, rather than a single overarching one; and second, that he was not personally involved in all acts undertaken by other members of the conspiracy.[41] Even assuming their truth, neither of these arguments establishes that Mr. Thompson and his co–Defendants were improperly joined.

■■■■ "To prove a conspiracy, the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal."[42] "Conspiracies are often described as taking one of two forms: a 'chain' conspiracy, where conspirators act separately and successively; or a 'wheel' or 'hub-and-spoke' conspiracy, where a central figure (the 'hub') interacts separately with peripheral parties (the 'spokes') in furtherance of a single, illegal enterprise."[43]

■■■■ As to hub-and-spoke conspiracies, the Third Circuit has explained that "the horizontal agreement among the spokes supports the agreements between the hub and each spoke, and vice versa."[44] Correspondingly, the Third Circuit has noted that:

> In the typical chain conspiracy, the actions of each coconspirator benefit the overall conspiracy.... The paradigmatic example in which the chain metaphor provides guidance is the drug conspiracy, where the conspirators often "share

a common goal, such as the possession and distribution of narcotics for profit."[45]

Regardless of the shape that the instant conspiracy bears—and perhaps this is a case where the underlying conduct would satisfy either construction—I am assured that Mr. Thompson was properly joined to the remaining eighteen co–Defendants. As thoroughly recounted above, the investigation into this matter revealed that Mr. Thompson was one of eighteen subjects who worked together to distribute heroin and other substances that were obtained from common sources, sold to common customers, distributed out of common operational sites, and discussed on common mobile telephone lines. That evidence is sufficient to exceed Rule 8(b)'s modest threshold.

Moreover, the allegation by Mr. Thompson as to the existence of multiple conspiracies is perhaps a dangerous fallacy in cases such as these. If one were to strain closely enough, any multi-defendant conspiracy could be dissected into various components at excessively minute levels of detail. That characteristic should not defeat joinder, as it would not defeat the prophylactic reach of our nation's conspiracy laws. Thus, it must be recognized that trial courts necessarily exercise judgment and discretion when considering whether large conspiracies are properly tried at once rather than repetitively and in distinct pieces.

---

41. ECF No. 317 at 2–3.

42. United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999) (Becker, C.J.). See also United States v. Rigas, 605 F.3d 194, 206 (3d Cir. 2010) (Fuentes, J.) (en banc).

43. In re K–Dur Antitrust Litig., No. 01–cv–1652(SRC)(CLW), 2016 WL 755623, at *18 (D.N.J. Feb. 25, 2016).

44. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 347 (3d Cir. 2010) (Scirica, J.).

45. United States v. Kemp, 500 F.3d 257, 289 n.19 (3d Cir. 2007) (Cowen, J.) (quoting United States v. Tarantino, 846 F.2d 1384, 1393 (D.C.Cir.1988)).

Anticipating arguments such as this one, the United States Court of Appeals for the Fifth Circuit has upheld joinder under Rule 8(b) in a case where multiple conspiracies were charged in a single indictment. In United States v. Kaufman, for example, the Fifth Circuit explained that "[j]oinder of defendants is proper under Rule 8(b) where the record, examined broadly, presents two conspiracies substantially interrelated by their facts and participants rather than two separate and distinct conspiracies." [46] Again in United States v. Posada–Rios, the Fifth Circuit upheld joinder under Rule 8(b) where a "subsidiary conspiracy" was joined with a primary one, because the two conspiracies "were not separate or distinct" but "were substantially interrelated by their facts and common aims." [47]

▇▇▇▇ Neither does Mr. Thompson's lack of involvement with the acts undertaken by every co-conspirator vitiate joinder. As the Third Circuit has previously remarked, "[I]t is well established that one conspirator need not know the identities of all his coconspirators, nor be aware of all the details of the conspiracy in order to be found to have agreed to participate in it." [48] It is, after all, black letter law that upon formation of a conspiracy, each defendant "is liable for the reasonably foreseeable acts of his co-conspirators committed in furtherance of the conspiracy." [49] Further, when a defendant's actions satisfy the fundamental elements of engagement in a conspiracy, such a charge may properly be maintained, regardless of whether the defendant's "involvement in the conspiracy was brief and did not extend over the longer period of time." [50]

Accordingly, for the foregoing reasons, joinder of Mr. Thompson and his co–Defendants was appropriate under Rule 8(b). He and his co–Defendants share a commonality of manner and means that reinforces the Government's contention that a joint indictment was entirely appropriate.

**B. In light of the evidence linking Mr. Thompson to his fellow co-conspirators and to Target Telephone # 7, he has failed to meet his burden of identifying clear and substantial prejudice sufficient to outweigh the strong preference for joint trials of co-conspirators.**

▇▇▇▇ Federal Rule of Criminal Procedure 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." "Severance under Rule 14(a) is committed to the trial court's discretion." [51]

▇▇▇▇ A defendant requesting severance pursuant to Rule 14 "must demonstrate clear and substantial prejudice resulting in a manifestly unfair trial." [52] This is so because "[t]he public interest in judicial econ-

---

**46.** 858 F.2d 994, 1003 (5th Cir. 1988).

**47.** 158 F.3d 832, 862–63.

**48.** United States v. De Peri, 778 F.2d 963, 975 (3d Cir. 1985).

**49.** United States v. Ramos, 147 F.3d 281, 286 (3d Cir. 1998) (Alito, J.) (citing Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)).

**50.** United States v. Fernandez, No. CRIM.89–0037–01(CRR), 1990 WL 121806, at *2 (D.D.C. Aug. 7, 1990).

**51.** United States v. Dentico, No. 05–607, 2006 WL 757217, at *1 (D.N.J. Mar. 20, 2006).

**52.** United States v. Reicherter, 647 F.2d 397, 400 (3d Cir. 1981).

omy favors joint trials where the same evidence would be presented at separate trials of defendants charged with a single conspiracy." [53]

■ In considering the necessity of severance based on a such a claim, the Third Circuit has enumerated four factors for district courts to consider: "(1) the likelihood of co-defendant's testifying; (2) the degree to which such testimony would be exculpatory; (3) the degree to which the testifying defendant could be impeached; and (4) judicial economy." [54]

As a threshold matter, I agree with counsel for the Government's expectedly logodaedalian description of the Defendant's prejudice arguments as "a farrago of conclusory claims." [55] For starters, Mr. Thompson's primary claim of prejudice from a joint trial is what he terms "an inconsistent defense" among himself and certain other co–Defendants.[56] Mr. Thompson does not expound much on the particulars behind this "inconsistent defense." Rather, he merely highlights that different evidence was found on each of the co-conspirators present at the time of his arrest.

■ Presumably, Mr. Thompson is suggesting that he will defend on the basis that the confiscated contraband belonged not to him but to others. Somewhat opaquely, however, the Defendant goes on to state that "[w]hile the courts have not granted severances based on finger pointing or blame shifting alone, there is prejudice in this situation to Defendant Thompson in that the evidence for that 5 day period in January of 2016 points to Defendants Edwards and Johnson." [57] From my perspective, Mr. Thompson does little to explain how that case theory is in any way distinct from "finger pointing or blame shifting alone" or how his quite evident involvement with the other co-conspirators who were present at the time of his arrest explains away the role for which he was jointly indicted in the first place. Importantly, "[i]n this Circuit, a defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." [58]

Next, Mr. Thompson bluntly asserts that "he would present exculpatory evidence from some of the co-defendants in this case." [59] Yet, he provides no specificity (under seal or otherwise), despite acknowledging that "bold assertions are insufficient." [60] The Court agrees with the Government's summary of Mr. Thompson's testimonial prejudice claim: "While Thompson intones these factors, he provides no basis to believe any co-defendants would testify, how such testimony would exculpate him, whether the witnesses could be impeached, and why separate trials is not at odds with the interests of judicial

---

53. United States v. Thornton, 1 F.3d 149, 153 (3d Cir. 1993) (quoting Eufrasio, 935 F.2d at 568.

54. United States v. Boscia, 573 F.2d 827, 832 (3d Cir. 1978).

55. ECF No. 334 at 16.

56. ECF No. 317 at 6–7.

57. Id. at 7.

58. Somers, 496 F.2d at 730. See also Zafiro, 506 U.S. at 538–39, 113 S.Ct. 933 ("Mutually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

59. Id. at 7.

60. Id.

economy." [61] As such, the Court would decline to hear the in camera testimony that Mr. Thompson suggests will alleviate himself from liability—he has not made a threshold showing that such testimony exists and would be trustworthy.

Mr. Thompson also seems to suggest that he risks sustaining negative inferences were he to proceed with at least one other co–Defendant who also faces firearms charges under the Superseding Indictment. However, the case law requires a more substantial risk of prejudice than the mere specter of the discussion of firearms to warrant severance in a drug conspiracy case.

For example, in United States v. Eufrasio, the Third Circuit affirmed a denial of severance as to indicted co-defendants, where "all appellants were charged with the same conspiracy" but only some were involved with "murder," "gambling," "extortion," and "loansharking." [62]

Again, in United States v. Melvin, the United States Court of Appeals for the Fourth Circuit affirmed a trial court's denial of severance where evidence of a shooting was introduced as to certain defendants but not to others. [63] In so holding, the Fourth Circuit reasoned that severance was unwarranted, as the bulk of the testimony "concerned the distribution of drugs" and the evidence of the shooting "was not the highlight of the government's case." [64]

Similarly, the Fifth Circuit in United States v. Posada–Rios affirmed a district court's denial of severance in a case where certain co-conspirators had engaged in egregious conduct, including the commission of "gruesome murders" before they joined the conspiracy. [65] As the Fifth Circuit explained, "[w]hile the district court must guard against undue prejudice, it need not protect conspirators from evidence of their confederates' acts in furtherance of their common illegal aim." [66]

What's more, the initial discovery in this case reveals that firearms both comprised a sizeable portion of the goods bartered for by the conspiracy and functioned as a key measure for co-conspirators to defend their geographic markets and threaten retribution. Mr. Thompson is not a low-level embezzler or a backwoods fraudster joined with other defendants whose actions, if proven, would be disproportionately prejudicial or dissimilar in nature from that of his own alleged conduct. Rather, he falls in generally the same strata as his co–Defendants who used similar means to bring about the conspiracy's illicit objective.

Other federal courts have quite astutely observed the inherent connection between drugs and guns: "[I]n the context of drug distribution offenses that items like those at issue here—firearms, large sums of cash, weighing scales, and uncharged quantities of illegal drugs .... have generally been viewed as 'tools of the trade'— that is, means for the distribution of illegal

---

**61.** ECF No. 334 at 21.

**62.** 935 F.2d at 568. See also United States v. Jiminez, 983 F.2d 1020 (11th Cir. 1993) and United States v. Lopez, 649 F.3d 1222, 1242 (11th Cir. 2011).

**63.** No. 05–4997, 2007 WL 2046735, at *5 (4th Cir. July 13, 2007) (citing United States v. Pepe, 747 F.2d 632, 651 (11th Cir. 1984) (finding that "judicial economy weighed

heavily against severance in [] complex case")).

**64.** Melvin, 2007 WL 2046735, at *5.

**65.** 158 F.3d 832, 863 (5th Cir. 1998).

**66.** Id. ("A long and complex trial like this one taxes the patience and vigor of the judge, jury, and counsel.").

drugs." [67] "[T]his Court has long recognized that, as Forrest Gump might say, drugs and guns go together like peas and carrots." [68]

Further, the recognized public policy in favor of joint trials of alleged co-conspirators is particularly weighty in this case. "[G]ood reasons support the general rule that persons charged with conspiracy should be tried together ... Chief among these is the conservation of public resources that would be lost if the same evidence were presented at separate trials and the decreased possibility of prejudice where the evidence against each defendant is strong." [69] As the Honorable Christopher C. Conner, Chief Judge of this Court, wrote in his April 5, 2016 decision in United States v. Martinez–Osoria, "Indeed, joinder of such coconspirators in a single charging document is encouraged, as the claim of conspiracy provides the requisite 'common link' among defendants." [70]

In fact, the widespread use of a set of mobile telephone numbers well known to drug users was the modus operandi of the conspiracy as a whole, and the evidence indicates that Mr. Thompson utilized the same mobile number as other co-conspirators to facilitate drug transactions. He was also arrested with a group of co–Defendants who were connected to others named in the Superseding Indictment either through firsthand interactions, through supply agreements, or through the shared use of the known network of mobile phone numbers. I therefore agree with the Government's observation that "[b]ecause the evidence against Thompson will be substantially the same, whether he is tried separately, or together with his co-defen-

dants, there is no significant prejudice from a joint trial." [71]

There are, of course, other miscellaneous factors that counsel against severance: although the Superseding Indictment seeks forfeiture of certain weapons utilized or obtained by members of the conspiracy, only one of Mr. Thompson's eighteen co–Defendants was charged with a substantive firearms offense in violation of 18 U.S.C. § 922(g)(1). Further, the Court would not be opposed to issuing a limiting instruction as to the admissibility of evidence of firearms usage or possession to the extent that such an instruction would be appropriate. Moreover, since the Superseding Indictment was handed down in February 2016, three of Mr. Thompson's co-conspirators have already entered pleas of guilty at the time of this writing.

For all these reasons, Mr. Thompson has not met his heavy burden of establishing a clear and specific threat of prejudice sufficient to outweigh the public interest in joint trials of alleged co-conspirators.

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion to sever is denied. An appropriate Order follows.

### ORDER

**AND NOW**, this 2nd day of November, 2016, in accordance with the accompanying Memorandum, **IT IS HEREBY ORDERED** that the Defendant's Motion to Sever, ECF No. 316, is **DENIED**.

---

**67.** United States v. Martinez, 938 F.2d 1078, 1083 (10th Cir. 1991).

**68.** Lopez, 649 F.3d at 1242.

**69.** United States v. Console, 13 F.3d at 655.

**70.** No. 1:15–CR–153, 2016 WL 1320925, at *5 (M.D. Pa. Apr. 5, 2016).

**71.** ECF No. 334 at 19 (emphasis added).